———o———

GEORGE POMEROY, Respondent, vs. WM. H. BENTON, Appellant.

1. *Equity—Partnership—Fraud — Misrepresentations or concealment between partners—Pleading—Sufficiency—Relief—Vigilance.*—Where one member of a firm who had the entire management of the partnership, without the knowledge or consent of his co-partner used the money, assets and credit of the concern in outside speculations, and appropriated the benefits to himself individually, and subsequently rendered to his co-partner a false balance sheet, purporting to correctly exhibit the true condition of the firm affairs, but which in fact did not mention or allude to the outside operations, and assured his co-partner that this statement was correct, and on the faith of this statement and his representations his partner was induced to convey to him all his interest in the concern, and to execute a bill of sale therefor, which though not mentioning the profits of the said outside operations, was in form sufficiently broad to cover them, Held:

1st. That a petition setting forth the above facts and concluding with a prayer for a re-opening of the settlement and a prayer for general relief, stated a cause of action; and the prayer for general relief authorized any relief consistent with the facts alleged.

2nd. That it was no excuse or defense that the co-partner might have discovered the wrong, and prevented its accomplishment, had he exercised watchfulness. Lack of vigilance only serves as a defense where the party being apprised of, slumbers upon his rights.

2. *Partnership—Outside ventures by one partner, with partnership funds.*—Outside of any stipulations in the partnership articles, good faith should restrain

one partner from embarking the funds or credit of the firm outside of their legitimate scope, and for his own advantage; and if such ventures are made by one partner, he cannot appropriate the profits to himself, but must account for them to the partnership.

3. *Partnership—Agency—Responsibility between partners.*—Every partner is the agent of his co-partner, and the same rules and tests are applied to the conduct of partners, as are ordinarily applicable to that of trustees.

4. *Fraud—Misrepresentations—Ignorance of facts.*—It is not material whether or not the person making false representations upon which another acts to his own disadvantage knows them to be false; the assertion to the injury of another, of something not known to be true, is equally reprehensible, in law as in morals, with the assertion of that known to be false.

5. *Practice, civil—Pleading—Petition—Sufficiency of allegations of—Objections when must be taken.*—Under our code (2 Wagn. Stat., 1012, ₰ 1; 1015, ₰ 10), if a petition, however inartificially drawn, do but state a cause of action and no objections are taken to the formal sufficiency of the allegations either by demurrer or answer, the defendant is deemed to have waived all such objections.

6. *Equity—Fraud—Contracts—Construction of.*—A Court of Equity looks not so much at the legal formalities with which a transaction is clothed as to its very pith and substance; and where a contract is in form broad enough to cover many things not in terms expressed upon its face, but it is manifest that the minds of the parties never met and concurred in reference to these matters, and where fraud has been practiced, equity will disregard mere technical forms and only attach to the contract the effect which both parties had in view at the time of its execution and delivery.

## Appeal from St. Louis Circuit Court.

*Samuel Knox, Sharp & Broadhead, and Glover & Shepley,* for Appellant.

I. A partner who improperly uses the money of the firm (and money raised by using the name of the firm, is money of the firm as much as any other) shall pay interest on the misused money and account for any profits derived from its use. (Glossington vs. Waters, 1 Sim. and St., 124; Stoughton vs. Lynch, 1 Johns. Ch., 467; Long vs. Majestre, 1 Johns. Ch., 305; 3d Kent. 5th Ed., 51; Collyer on Part., §§ 184, 185, 186, 221, 249; Somerville vs. McKay, 16 Vesey, 282.)

II. If defendant destroys testimony to prevent its use against him, the law furnishes a stringent rule to deal with the case. All things are presumed against the spoliator. When a party to a suit has testimony in his possession which

he will not produce, all things are presumed against him. (1 Taylor, Ev., 96, 97.) The court held that the finder of a lost jewel, who would not produce it, should pay the highest value of a jewel of its kind. (Armory vs. Delamore, 1 Strange, 505.) Where defendant had suppressed a will, but the contents were not precisely shown, the court presumed it to be as alleged, and entered a decree for the estate until it was produced. (Daulston vs. Cotesworth, 1 P. W., 731.) If a man destroys a thing designed to be evidence against him, a small matter will supply it. (1 Lord Raymond, 731.) When a party withholds evidence, and the secondary evidence is uncertain as to dates or sums, or boundaries, etc., every intendment shall be against the withholder. (7 Wend., 31.) A witness was put on the stand to prove the course and distance in a deed that was withheld by the other party, and the witness failed to make the proof clearly. The court said they would presume the fact to be as alleged. (18 Johns., 351.) The jurisdiction in case of spoliation has gone a long way. " To such a length I should have difficulty in following, if not bound by authority and precedent. To say that once you prove spoliation you may take it for granted that the thing spoliated was what it is alleged it was, may be going a great length in many cases." (Baker vs. Roy, 2 Russ. Ch., 73.)

III. The settlement was procured by fraud, and not binding, the profits on vouchers and whisky were not embraced in it, and not in contemplation of Pomeroy when he sold, and were, therefore, in equitable consideration, not paid for by Benton—not sold to him in equity—though in form they were. Mr. Pomeroy under the law had his choice either to rescind, disaffirming the sale, or to affirm the sale and have his damages.

1st. He was not bound by law or equity to rescind the sale if he was betrayed by Benton, through fraudulent representations, into a settlement of his accounts on a false basis, and afterwards made a sale of his interest on the basis of that settlement, but had the right to affirm the sale and claim his damages. When a party has been deceived by fraudulent

representations and thus led into a contract, he may affirm the contract and recover damages for the fraud. (Fenimore vs. U. S., 3 Dallas, 357; Culver vs. Avery, 7 Wend., 380; Taylor vs. Tillotston, 16 Wend., 494.) If the party affirm the sale, that takes away the right to rescind and leaves him only the right to recover such damages as he sustained by the fraud. (Whitney vs. Allaine, 4 Denio, 554; Kellogg vs Denslow, 14 Conn., 411; Boorman vs. Johnston, 12 Wend., 556; Waring vs. Mason, 18 Wend., 426; Holland vs. Anderson, 38 Mo., 55.) If a settlement is made between partners, and on faith of that settlement one pays the other more than his due, the sum overpaid may be recovered back by an action of assumpsit. (Bond vs. Hays, 12 Mass., 34.)

2nd. A party situated as Mr. Pomeroy was might have rescinded, undoubtedly; but to have had rescision he should have asked for it, and should also have shown the property on hand and not changed in condition; and that all parties could be put in *statu quo*. (Carrol vs. Rice, Walker, Ch., 373.) When such facts do not appear, rescision is impossible, and compensation is all the remedy a plaintiff can have. The defendant makes no allegation that the rescision is possible, or that the thing sold remained in *statu quo*.

3rd. In this case Mr. Pomeroy prays to have the settlement based on the false balance sheet held fraudulent; but does not ask to rescind the sale, and could not have rescision if he did ask it, for the sale was of a stock of dry goods, delivered two years and more before the fraud was discovered, and there is no showing that they had not all been sold long before the petition was filed. (Bradbury vs. Keas, 4 J. J. M., 446.) There can be no rescision unless parties can be put in *statu quo*. (Pintard vs. Martin, S. & M. Ch. 126; Golden vs. Maupin, 2 J. J. M., 239; 2 Story, Cont., p. 550, § 977.) Such a stock of goods and assets could not remain in *statu quo*. The plaintiff, therefore, has in law and equity a remedy for this fraud. The law will compel a fraudulent vendee, to compensate for the injury he has done.

IV. It has been suggested, if we are not mistaken, that the present petition is a suit in equity; and that the plaintiff should have sued at law. What did the learned counsel mean by a suit in equity? What alteration should be made in the petition to make it acceptable as a petition at law? Our Code, ch. 161, Gen. Stat., 1865, says: "There shall be in this State but one form of action." In that form of action the plaintiff states his facts. The legal inevitable consequence is, that if the facts which give a cause of action are stated, the proper relief must be given, no matter whether it is legal or equitable. If the petition of Pomeroy states facts that affirm this fraudulent sale, that is, do not disaffirm it, and prays for damages in proper terms, the petition is all right. This is the sense of the code, and this is the course of adjudication upon it. The code abolished all rules of pleading which were merely technical; none remain but such as truth and justice require. (Cobb vs. West, 4 Duer., 38; Haight vs. Child, 34 Barb., 186; Scott vs. Pilkington, 15 Abbot, Pr., 280; Butterworth vs. O'Brien, 24 How. Pr., 438; Winterton vs. 8th Avenue R. R., 2 Hilton, 389; 15 Abbott, 445; Durant vs. Gardner, 19 How. Pr., 94; Marquat vs. Marquat, 2 Kernan, 336.) The plaintiff is entitled to any relief, legal or equitable, which arises on the facts of his petition. (Charless vs. Rankin, 19 Mo., 490.) In any event, as the defendant has not pleaded remedy at law, the court will go forward and render judgment on any cause of action, legal or equitable. (Underhill vs. Van Courtland, 2 Johns. Ch., 369; Ludlow vs. Simond, 2 Caines' Cases, 40; Livingston vs. Livingston, 4 Johns. Ch., 290; Grander vs. Leroy, 2 Paige, 509; Hawley vs. Cramer, 4 Cow., 727; Leroy vs. Pratt, 4 Paige, 81; Burrough vs. McNeil, 2 Dev. & Bat. Eq., 300; Cable vs. Martin, 1 How. Miss., 561; Davis vs. Roberts, 1 Sm. & M. Ch., 550; Holmes vs. Doll, Clark R., 75.) This case shows how the defense must be set up. (Osgood vs. Brown, 1 Freeman, Ch., 392; Miller vs. Furze, 1 Bailey, Eq., 187; Mays vs. Taylor, 7 Geo., 244; May vs. Goodman, 27 Geo., 353; Fowler vs. Halbart, 3 Bibb, 384; Supervisors, etc vs. Utica, etc., 1 Barb. Ch., 343.) The chancellor said he had

not considered if the claim was legal or equitabe, as there was no such defense. (Viburt vs. Trait, 3 Abbott, Pr.. 119 ; 6 Abbott, Pr., 6 ; 4 Paige, 400.) The same doctrine prevailed in Missouri, till lately. (Oldham vs. Trimble, 15 Mo., 229 ; Black vs. Chase, 15 Mo., 347 ; Martin vs. Greene, 10 Mo.. 652.) But there is in matters of fraud, a concurrent jurisdiction both in law and equity.

To resume then, our conclusions are these : That the plaintiff has been wronged, and must have some sort of redress from the court. Originally he might have demanded rescision or damages. He is not entitled to rescision now, he did not come soon enough, nor till the condition of the property had changed, and the property had been disposed of. It is, therefore, compensation or nothing. The law allows plaintiff to affirm the contract and recover damages. There is nothing in the form of plaintiff's action to prevent his recovery. The plaintiff not being obliged to rescind the outstanding sale or bill of sale unannulled, is no defense, the plaintiff's petition is not a bill in equity ; but if it were, the defense remedy at law cannot be set up now, because (1) it is abolished, (2) it is not pleaded.

*Cline, Jamison & Day, and John M. Krum,* for Respondent.

I. The bill of sale is plain and simple, couched in comprehensive language, and as a legal instrument remains a complete barrier, both at law and in equity, to any action that may be instituted by the appellant against the respondent, unless it first be set aside in a direct proceeding by a court of competent jurisdiction.

It can neither be surcharged nor falsified ; if it be voidable on the ground of fraud, it must be avoided in *toto*. It cannot be affirmed in part and avoided in part. It was a lumping bargain and not a sale of Mr. Pomeroy's interest in any particular chattel or land, or of his interest in any particular sum or balance.

The instrument must speak for itself. It applies the consideration to the entire interest sold, and does not pretend to distribute or apportion it among the various rights assigned; its scope and operation can neither be limited or extended by oral proof. There can be no doubt but that it conveys every right of appellant growing out of said firms to respondent, including those claimed in this suit, as well as all others, and as he has not seen fit to place it in the power of the court to set aside or annul the sale and restore the parties to their original positions in these firms, it stands as a legal bar to the prayer in the bill. Equity will not assist the appellant to annul this sale for the purpose of getting an interest in the gains and profits of the whisky and voucher adventures alleged in the bill to be firm transactions, and at the same time, affirm the sale for the purpose of retaining the consideration of two hundred and seventy-five thousand dollars already paid to him by the respondent. Nor can he avoid the universal, inflexible and inexorable rule of equity by calling the sale a settlement. The instrument is before the court and speaks for itself. Its legal character can be tried by inspection. It requires no christening to give it a name. This it received at its conception and birth. It came into life pronouncing its own name. Any one who reads it cannot fail to see that it is a bill of sale and not a settlement, as claimed by the counsel for the appellant.

II. Now, if this sale be voidable on the ground of fraud, on proper application, the remedy a court of chancery would afford would be to place the parties in the same condition they were in before it was made. (Brown vs. Lamphear, 35 Vt., 252; Chase vs. Garvin, 19 Me., 211; Skilbeck vs. Hilton, L. R., 1866, 2 Eq., 587.) If, for example, a bill be filed by the obligor of an usurious bond, to be relieved against it, the court in a proper case will cancel the bond, but only on his refunding the money advanced. The equity is to have the entire transaction cancelled, and if the party complaining will have equity, he must do equity. (Daniel vs. Mitchell, 1 Story, 173; Hardy vs. Handy, 11 Wheat., 103; Driver vs. Fortner,

5 Porto, 9; Brodgen vs. Walker, 2 Har. and John, 285 ; Waters vs. Lemon, 4 Hamm., 229 ; Lowey vs. Cox, 2 Dana, 469 ; White vs. Trotter, 14 Sm. and M., 30; Bruen vs. Hone, 2 Barb. S. C., 586 ; Doggett vs. Slade, 7 Blackf., 128 ; Hill vs. Hill, 3 H. Lords, Cas., 828.) The Court of Equity will remit both parties to their original position, and will not relieve the complainant, leaving him the fruits of the transaction of which he complains. (Harrison vs. Keating, 4 Hare, 1-6 ; Skilbeck vs. Hilton, L. R. 2 Eq., 587 ; Jarrett vs. Morton, 44 Mo., 275 ; Boyne vs. Vivian, 5 Ves., 604.)

III. It cannot be claimed that this is a bill to set aside the sale. If this be attempted on the part of the plaintiff, the rule of pleading will prevent it ; as it is universally held that no relief can be granted under the general prayer, that is contrary to the theory of the bill or inconsistent with the special prayer. This is a bill to surcharge and falsify accounts. Six particular matters of omissions are specified for surcharging, and the court is called on to open the accounts of Pomeroy & Benton, and to permit the plaintiff to surcharge as to these matters only, thus limiting the general prayer to all other and further relief, that the plaintiff might be entitled to or in any way growing out of his special prayer to open the accounts, as to those particular matters set forth in the bill, and to none other. No relief can be granted under a general prayer entirely distinct from and independent of the special relief prayed. (Thompson vs. Smithson, 7 Porter, 144 ; Foster vs. Cook, 1 Hawks, 509 ; Chalmers vs. Chambers, 6 H. and J., 29 ; Sheppard vs. Starke, 3 Munf. 29 ; Butler vs. Durham, 2 Kelley, 414 ; Chapman vs. Chapman, 3 Beas., 308 ; Dunnock vs. Dunnock, 3 Md. Ch., 140 ; Thomas vs. Ellmaker, 1 Parsons' Eq., 99.) .

IV. As this is claimed to be a bill to set aside a settlement in particular matters specified, and as it has turned out on trial that there was no settlement, then there is no equity in the bill.

V. If there was a settlement, and afterwards appellant sold out his interest in these firms to the respondent, as shown by

the bill of sale read in evidence, then appellant has no equity in his bill, for even though they may have had many partial or complete settlements during the existence of these firms, yet, if the appellant sold all his interest in the assets of the firms to the respondent, it matters not how many errors or how much fraud has been committed in these various settlements, as its discovery by bill can in no wise afford any relief to the party injured by the mistake or fraud, unless the sale be annulled.

VI. If it be shown that matters should have entered into these settlements that were omitted, it does in no sense show that all right thereto did not pass by the bill of sale ; and if it be not rescinded, what equity has the plaintiff against the settlement ?  Suppose the settlement be surcharged and falsified, does not the bill of sale, so long as it remains unrescinded, continue to vest every right, interest and claim pertaining to or growing out of the surcharged settlement, in the respondent in like manner as it did before the settlement was disturbed ?  Then what has been gained by this useless ceremony, as the title to the property has passed to the respondent by an undisturbed sale, and the appellant has lost thereby all right or equity to have the settlement, if there was one, disturbed so long as the sale continues to stand ?  In short, the only means the appellant has to reach any supposed error in any supposed settlement would be to file a bill to set aside the sale, and unless his equities be sufficient for this purpose, then he must be forever barred.

VII. If the appellant had filed a bill to set aside the sale on the ground set up in this petition to *surcharge* the accounts and alleged settlement, and respondent had not seen fit to join in the prayer to have the sale rescinded and to be restored to the position he was in before the purchase was made, he would have been at liberty, by answer in the nature of a cross-bill, to have set up all these matters in his defense of the sale, or, after the sale was set aside, to have brought them forward in the adjustment of the partnership accounts : all of which the appellant has endeavored to avoid by attempting to

affirm the sale and at the same time go behind it. He attempts to use the sale as a shield to guard himself against the right of the respondent to call him to account for the gains he has made out of the money he drew from the firm, and at the same time he disregards it when it stands in the way of his own interest, or would defeat his claim that respondent's private gains should be declared firm profits.

The respondent could not plead his defenses by way of cross-bill so long as the appellant affirmed the sale.

VIII. As long as the sale remains unimpeached it stands as a barrier between the parties; neither can claim relief unless it be first removed out of the way, as a bill can confer no jurisdiction upon a court of equity by a prayer to discover that upon which no court could grant relief.

On this point, both parties must be placed on the same footing. (Gallatin vs. Erwin, Hop. 48; S. C., in 8 Cowan, 361; May vs. Armstrong, 3 J. J. Mar., 262; Daniel vs. Morrison's Executors, 6 Dana, 186; Fletcher vs. Wilson, 1 S. & M. Chy., 376; Draper vs. Gordon, 4 Sanf. Chy. R., 210; Josey vs. Rogers, 13 Ga., 478; Slason vs. Wright, 14 Vt., 208; Rutland vs. Page, 34 Vt., 181; Cross vs. DeValle, 11 Wallace S. C., 14; Hurd vs. Case, 32 Ill., 45.)

IX. Take this case in another point of view, and suppose it to be an attempt to annul the sale in part and to affirm it in part.

This cannot be done in this or any other case. (Hill Sales, 306; Allen vs. Edgerton, 3 Vt., 445.)

X. Plaintiff must first do equity before the court will give him equity, or even listen to his complaint.

The sale was not absolutely void, and if it be disturbed on the ground of fraud, all parties must be placed in the same situation they were in before the sale; and unless this can be done, it would be inequitable for the court to interfere or grant relief. And no case can more fully illustrate this rule of equity jurisprudence than the case at bar.

SHERWOOD, Judge, delivered the opinion of the court.

This was a suit in the nature of a bill in equity. The plaintiff and defendant were for a number of years co-partners, under the name and style of Pomeroy & Benton, engaged in the wholesale dry goods business, in the city of St. Louis, where the defendant resided and managed the business of the firm, while the plaintiff resided in the city of New York, attended to the affairs of the firm at that point, and seldom visited St. Louis.

The petition, in substance, charges that defendant, in violation of the articles of co-partnership and of his duty as partner, and without the knowledge or consent of plaintiff, used the money, credits and assets of the firm in the purchase of government vouchers and whisky, and in various other ways misappropriated the money, credits and property of the firm, whereby he realized immense profits; that he fraudulently omitted to charge any of these matters on the partnership books; that subsequently he forwarded to plaintiff a false balance-sheet, purporting to be a correct exhibit of the whole partnership affairs, but it in fact did not mention any of the speculations in which defendant had been engaged, or of the profits he had realized; that this balance-sheet, defendant, though knowing the contrary, assured plaintiff was correct; that by these representations, and other fraudulent conduct and contrivances, defendant induced the plaintiff, who relied solely on the defendant and his representations, to settle with him on the basis of the balance-sheet, and to sell out to him his entire interest in the firm for $275,000, a sum far below its real worth. The petitioner concludes with a prayer for opening the settlement and taking an account as to the matter complained of, and for general relief.

All the material allegations of the petition were denied by the answer, which also set up as new matter of defense, that defendant had purchased of plaintiff his entire interest in the firms of Pomeroy & Benton, Pomeroy, Benton & Co., Pomeroy, Durkee & Co., and Pomeroy & Durkee, for the sum of $275,000, and received a bill of sale therefor, whereby the

firm of Pomeroy & Benton was dissolved, and the entire interest of plaintiff in the goods, property and assets of that firm were conveyed and assigned to defendant, on the first day of January, 1865, and that plaintiff from that time forward had no further interest, right or claim in the firm of Pomeroy & Benton, or the other firms mentioned, and that plaintiff was thereby barred of having the relief prayed for, etc. There was no reply filed.

Laying aside for the present all inquiry as to the sufficiency of the petition and the effect to be given to the defendant's answer, what the evidence in the cause establishes will be briefly adverted to, and the questions of any practical importance necessarily arising therefrom stated and discussed.

Those questions are two, viz: First, did the defendant appropriate the credits or funds of the firm to his own private use in the purchase of government vouchers and whisky? Second, was such appropriation made without the consent & in fraud of the rights of the plaintiff?

I am forced to the conclusion, after a careful perusal of the evidence, that both these questions must receive a reply in the affirmative, as it is abundantly established by the testimony, that the defendant, prior to the dissolution of the firm, in contravention of the articles of co-partnership and of his duty as partner, appropriated its monies and credits to his own private use, in the purchase of vouchers and highwines, for which he never accounted, but on the contrary, induced the plaintiff to execute to him a bill of sale sufficiently comprehensive *in form* to embrace the former's entire interest in the firm ; when the balance-sheet, which was used as the basis on which the sale was effected, made no mention of, and contained not the most distant allusion to the profits fraudulently realized by the defendant, and of which, as shown by the testimony, plaintiff was entirely unaware, reposing as he did in defendant and his representations the most implicit confidence. It is no excuse for, nor does it lie in the mouth of the defendant to aver, that plaintiff might have discovered the wrong and prevented its accomplishment, had he exercised

watchfulness, because this is but equivalent to saying : "*You trusted me, therefore I had the right to betray you.*" *Vigilantibus et non dormientibus equitas subvenit*, is without application here; it only applies where a party being apprised of, slumbers upon his rights. For the betrayal of confidence reposed, the skillful lulling to rest of the intended victim, the adroit closing of every avenue through which apprehension might enter—whether this be done by words or by "*expressive silence*,"—are the ear-marks of successful fraud the world over. And a court of equity, should it make such a perverse application of one of its fundamental maxims as that seemingly insisted on by defendant's counsel, would become the efficient ally of the *vigilant* wrong-doer, and prove recreant to its past history and the principles on which its very jurisdiction rests.

That the balance-sheet was the basis of the estimate of plaintiff's interest in the concern, is sufficiently clear, proven as it is by the testimony of plaintiff, as well as by defendant's admissions to Wilkerson. It is equally clear that the voucher and whisky transactions were not included in such estimate. These things defendant claimed and still claims as his own. It is not shown by the evidence, that the dealings in the trade-store at Natchez ever embraced transactions in vouchers or whisky; the defendant himself would not assert that they did; so that plaintiff's consent as to the operations at that point could afford no protection for defendant's conduct in regard to those matters. And besides, the defendant would not venture to deny what the plaintiff positively asserts, that he knew nothing of the whisky or voucher transactions of the defendant until long after the dissolution of the firm. Manifestly, plaintiff could not yield assent to nor waive that of which he was ignorant. Even if it be conceded for the sake of argument, that the defendant was permitted to withdraw from the capital of the firm a considerable sum for his own use, still this would by no means authorize the speculations into which he plunged; and this is apparent for several reasons:

First, the articles of co-partnership expressly forbade them.
Second, the sums which defendant might have drawn for his
individual use were far exceeded in amount by those really
employed in such speculations.   Third, it nowhere satisfac-
torily appears in evidence, that the amounts which could have
been legitimately drawn, were ever actually embarked in
those speculations.   And, fourth, that good faith, which
should be the animating principle of all mercantile associa-
tions, (all the authorities on partnership speak this language)
should have restrained the defendant from embarking the
funds or credit of the firm, outside of their legitimate scope
and for his own individual benefit.   For not only are gross
frauds committed by one partner against another prohibited,
but transactions of a more plausible nature, as intrigues for
private advantage, are held as offenses against the partnership,
equally forbidden, and therefore relievable in a court of equity.
(Collyer on Part., § 179 ; Smith's Merc. Law, 54 ; Feather-
stonhaugh vs. Fenwick, 17 V♯, 298 ; Fawcett vs. Whitehouse,
1 Russ and Myl., 132 ; Russell vs. Austwich, 1 Sim., 52.)

It has accordingly been held that one partner is accountable
in equity to his co-partner for his proportion of the profits of
a venture, although *outside* of the firm's scope of business, if
the money (or what is tantamount thereto, the credit) of the
firm, is used in such venture.   For, as Lord Eldon says :
There is an implied obligation among partners, to use the
property for the benefit of those whose property it is. (Craw-
shay vs. Collins, 15 Ves., 218 ; Brown vs. Litton, 1 P. Wm.,
140 ; Stoughton vs. Lynch, 1 Johns. Ch., 467 ; Collyer on
Part., § 182.)

So far has the rule which requires the utmost good faith
between co-partners prevailed, that where a partner, in viola-
tion of the partnership articles, but *without* using the part-
nership funds therefor, embarks in outside enterprises, a
court of equity will decree his co-partner as a partner with
him in such separate business. (Collyer on Part., §§ 221-
249 ; Somerville vs. McKay, 16 Ves., 382.)   And a bill mak-
ing such allegations has been held maintainable, and that an

account could be taken, although an action at law would lie for the breach of the articles.

At the trial the claim was seemingly urged by the defendant, that as in 1864, plaintiff was loaning out the firm's money at six or seven per cent. interest, and a considerable amount was also lying idle in bank at New York, that therefore there was no impropriety in his using the firm funds in St. Louis, being charged, as he states he gave strict directions to the book-keeper to do, with 8 per cent. interest on call. But unfortunately for this shallow pretense, evidently an afterthought, no charge against the defendant for interest (only a very inconsiderable sum) was ever made on the books of the firm, notwithstanding the large sums he was constantly using. Even, however, had he been charged with interest on every dollar he misappropriated, still this would not be enough; he must be held answerable as well for the *profits* he has derived out of the partnership funds. (Collyer on Part., § 182; Stoughton vs. Lynch, 1 Johns. Ch., 467; Brown vs. Litton, 1 P. Wms., 140; Sto. on Part., § 178; Herrick vs. Ames, 8 Bosw. 115.)

To such an extent have courts of equity gone in this direction, that if there be any doubt as to whom the funds in such case belong, that doubt will be resolved in favor of the partnership and they will be held as belonging thereto.

That every partner is the agent of his co-partner is a very familiar doctrine, and it arises from the necessities of the co-partnership relation. A doctrine equally well settled, though not yet hackneyed through frequent quotation, is, that *the same rules and tests are applied to the conduct of partners as are ordinarily applicable to that of trustees;* and that the duties, functions, rights and obligations of partners may be for the most part comprehended by the same words which define those of *trustees* and *agents.* (Collyer on Part., § 182; 1 Sto. Eq. Jur., §§ 468, 623; Kelly vs. Greenleaf, 3 Sto. R., 93.)

Mr. Justice Story, in his elaborate work on Equity Jurisprudence (Vol. 1, § 468), has remarked, in speaking of the duties of agents, as follows:

35—VOL. LVII.

"Courts of equity adopt very enlarged views in regard to the rights and duties of agents, and in all cases where the duty of keeping regular accounts and vouchers is imposed upon them, they will take care that the omission to do so shall not be used as a means of escaping responsibility or of obtaining undue recompense.

\* \* \* Upon similar grounds, an agent is bound to keep the property of his principal separate from his own; if he mixes it up with his own the whole will be taken, both at law and in equity, to be the property of his principal, until the agent puts the subject matter under such circumstances that it may be distinguished as satisfactorily as it might have been before the unauthorized mixture on his part. In other words, the agent is put to the necessity of showing clearly what part of the property belongs to him; and so far as he is unable to do this, it is treated as the property of his principal. Courts of equity do not in these cases proceed upon the notion that strict justice is done between the parties, but upon the ground that it is the only justice that can be done; and that it would be inequitable to suffer the fraud or negligence of the agent to prejudice the rights of his principal." At a subsequent period, in the case of Kelly vs. Greenleaf (3 Story Rep., 93) where a member of a firm had failed to keep proper books of account so that the firm property could be distinguished from his own, the learned judge cites the section just quoted with approval, and remarks with emphasis "Every word of this passage is equally applicable to the case of a partner acting as the agent of a partnership," and this was precisely the *status* of the defendant. Not only did the law imply, but his own express contract required, that he should see to it that the books of the firm were fairly and honestly kept, and this was especially the case as the plaintiff was acting for the firm in New York, while he had the personal management of the business in St. Louis, and nothing but a flagrant disregard of his partnership obligations could have induced him to so sadly neglect his duty in this particular and afterwards aggravate the wrong thus committed, by taking advantage of his culpable omission

and neglect. But he will not be permitted to employ his dereliction from duty "as a means of escaping responsibility" or of obtaining more than his proper proportion of the partnership effects.

What was the exact amount of the partnership funds which the defendant has converted to his own use, in the purchase of the articles referred to, is an inquiry which will probably never receive an answer in anywise approaching exactitude.

The defendant testifies that about $70,000 would reach his purchases in highwines; but the testimony of his brother-in-law, Sturgis, shows that in one single operation in Chicago he cleared about that amount. His operations in vouchers, he thought, would reach $200,000, but without any data to guide his recollection, he is positive they never reached half a million. He tells Catherwood he has cleared $25,000 on whisky under his contract with him, and gives him $5,000 as his share, and at a subsequent period does not deny that he owes him more; but when testifying he claims to have made only $19,377 on whisky and $26,460 on vouchers. But there is every reason to believe that these statements should not be regarded as importing absolute verity. Defendant indicates to George H. Chase, by means of some figures on a piece of paper, that he realized on whisky from $75,000 to $100,000—and he tells Catherwood that he had been engaged largely in the purchase of whisky, "but only as an agent," and that he stopped purchasing whisky, giving as a reason that "he was doing so well with the money in the purchase of vouchers, he preferred to buy them rather than risk it in whisky." And he tells Munson Beach that he paid for his house, $47,500, with money realized on vouchers. And the defendant's testimony shows that he paid for the vouchers which he purchased, by the checks of the firm, and never accounted for the profits.

The amount expended by defendant for vouchers, in the short space of time between August 1st, 1864 and the end of that year, as shown by Wilkerson's statement, was $271,058.25. As to how often the vouchers were turned into cash, whether

they usually remained on hand one day, one week, or one month, we are left totally in the dark—nothing elicited from the defendant throws any light on this subject; and the amount of his profits depend greatly upon the rapidity with which he could cash them, and reinvest their proceeds in other vouchers. And this alternation of purchase and sale would seem to have been the defendant's usual course of dealing when engaged in business of this description.

Whether the defendant knew that the balance-sheet furnished the plaintiff was incorrect, it is wholly immaterial now to inquire. For the assertion to the injury of another of something not known to be true, is equally reprehensible both in morals and law, as that which is known to be false. (1 Sto. Eq. Jur., § 193.) The defendant denies having asserted the correctness of the balance-sheet, but the seeming lack of candor he exhibits when testifying, the apparently evasive and contradictory replies he gives in response to questions propounded to him; his failure to satisfactorily answer whenever asked to tell of dates, amounts and other facts with which it would seem he must be familiar, render any statement he may make, open to very jealous observation.

But whether he made any such representations or not, does not at all affect his present liability. The relations of trust and confidence existing between the plaintiff and himself placed him under an equitable obligation to communicate all he knew, of the matter then pending, to the plaintiff, to "make a clean breast of it," to disclose to him all the material facts within his knowledge touching the negotiation then in progress as fully as though he had stepped upon the witness-stand and kissed the book, and nothing short of a complete disclosure of this sort could exonerate the defendant from the charge of undue concealment, which, under circumstances like the present, is, in the sense of a court of equity, itself a fraud. (1 Sto. Eq. Jur. §§ 204, 205, 207, 213, 214, 215, 216, 220 ; Bank of the Republic vs. Baxter, 31 Vt., 101 ; Martin vs. Greene, 10 Mo., 652 ; Jillett vs. U. N. Bk., 56 Mo., 304 ; Bruce vs. Ruler, 17 Eng. C. L., 290 ; Juzan vs. Toulmin, 9 Ala.,

662; Maddeford vs. Austwick, 1 Sim. 89, 8 B. and Cressw., 586. The doctrine here asserted, that confidence reposed, and the fullest disclosures are, in equity, correlative terms, is one in full accord with the authorities above mentioned and must commend itself to the cordial approval of every just mind, while it rebukes the manifestations of that spirit which, looking to its own advantage, is too prone to disregard the rights of those to whom it owes the fealty incident to intimate and confidential association.

In briefly commenting upon the evidence, I have hitherto omitted to make mention of that *wonderful book* in which defendant kept the accounts of his whisky operations, or of the peculiar and perilous vicissitudes through which it passed. At one time it was wholly consumed by fire; at another it met with only a partial destruction; but surviving all the destructive agencies arrayed against it, it is still extant, *except that portion which records defendant's transactions in whisky.*

It is simply impossible to review this portion of defendant's testimony and listen to his flimsy excuses and ever varying reasons in reference to this book, without being fully impressed with the idea that he destroyed that portion of it which he *did* destroy, for far more cogent reasons than any which he has yet seen fit to divulge. And this is made more especially apparent from the fact that the destroyed entries were not contained in any other book.

As the point has been referred to rather than pressed in argument, I will refrain from discussing the question whether the rule *in odium spoliatoris* is applicable to the facts of this case. The rule is certainly one of great stringency, and therefore should not be resorted to but in extreme cases, and where other means of proof fail.

Having thus considered the results properly deducible from the evidence, the sufficiency of the petition will next be discussed; and in reference to this, it may be observed that it states a *cause of action*, if fraud of the character charged therein and established by that evidence constitutes any ground

whatever for invoking remedial justice. And the petition concludes with a prayer for general relief which will authorize any relief consistent with the facts alleged. This was true under the *old* practice, and is more especially the case under the *new*.

As to whether the petition (if the bill of sale, while it stands, is to be regarded as an insuperable barrier to any relief) should have gone farther in its allegations, asked rescission of the contract and offered to surrender the $275,000, the consideration specified in the bill, as a condition precedent to having an account taken of the matter complained of, a ready and satisfactory reply is, that the petition passed unchallenged at the hands of the defendant, and it is rather late in the day, after he has pleaded to the merits and had a trial in which he enjoyed all the benefits which he could have had, even if the petition had been a model of perfection, for him to now come forward with the assertion that the petition is faulty in the particular referred to.

It is a fact, it would seem, not generally recognized, or at least, frequently ignored, that we have in this State, a *code*; that by that code are provided the forms of all pleadings, and the rules by which they are to be tested, (Wagn. Stat., 1012, § 1) and under the rules thus laid down in our practice act, if the petition, however inartificially drawn, do but state a cause of action, and no objections are taken to the formal sufficiency of its allegations, either by demurrer or by answer, "the defendant shall be deemed to have waived the same." (*Id.*, § 10, p. 1015.) "If the substantial averments are there and the adversary overlooks mere formal defects, his *statutory right* to indulge in critical objections is *swallowed up* in his *statutory waiver;* thenceforward he must address himself to the merits of the case." (Elfrank vs. Seiler, 54 Mo., 134; Russell vs. State Ins. Co., 55 Mo., 585.) And "if the allegations of the petition entitle the plaintiff to any measure of redress, a deaf ear will not be turned to his complaint, simply because he thinks justice should be dispensed to him in a particular way, other than and different from that to which he

is actually entitled." (Biddle vs. Ramsey, 52 Mo., 153.) And our legislature, as if determined, by "line upon line and precept upon precept," to inculcate a liberal construction of pleadings, has, in a subsequent chapter, given, among others, this additional mandate : " The court shall, in every stage of the action, disregard any error or defect in the pleadings or proceedings which shall not affect the substantial rights of the adverse party." (Wagn. Stat., § 5, p. 1034.)

Now it is difficult to conceive in what way the " substantial rights" of the defendant could have been prejudicially affected by the failure of the petitioner to allege plaintiff's willingness to surrender the proceeds of the sale, conceding for the moment that such allegation was necessary. But this concession will not be made, and among others, for the reason that a court of equity looks not so much to the legal formalities with which a transaction is clothed, as to its *very pith and substance.* So that even if the bill of sale were broad enough *in form* to comprehend all the interests which the defendant claims it did, yet as it is conclusively manifest from the evidence, that the minds of the plaintiff and of the defendant never met and concurred in the sale of those matters of which the plaintiff was ignorant, and which the defendant concealed, equity, in consideration of the fraud practiced, and disregarding mere technical forms, will hold that nothing passed by the bill of sale, only such matters as both parties had in view at the time of its execution and delivery.

Thus, it has been held, if an instrument is so general in its terms as to release the rights of a party to property to which he was totally ignorant that he had any title, and which was not within the contemplation of the bargain at the time it was made—in such cases the instrument will be restrained to the purposes of the bargain and the release confined to the right intended to be released or extinguished. (Ramsden vs. Hylton, 2 Ves. Sr., 304; 1 Sto. Eq. Jur., § 145.)

But it is with no small degree of inconsistency that the defendant at one moment claims that the bill of sale, until set aside is a complete bar to plaintiff's action, because it pur-

Fontaine v. Boatmans' Savings Institution.

ports to convey all of plaintiff's interest in the *partnership*; and then in the next vehemently asserts that the ventures in vouchers and whisky were *defendant's own individual speculations*.

For the reasons heretofore given, there existed no necessity for rescinding the sale, or that the present action should have been brought for that purpose, and with that theory in view. The evident object of the petition is to have an account taken as to those matters which were in reality *outside and independent* of the sale, although apparently embraced within its terms.

There was no new matter set up in defendant's answer, so that a reply was unnecessary. The answer only set forth the sale with greater formality than had been already done in the petition.

Judgment reversed and cause remanded, with directions to the court below to have an account taken in conformity to this opinion, and in thus taking the account the defendant is to be treated in all respects as a trustee. Judge Lewis not sitting; the other judges concur.