### BOWMAN v. PATRICK et al.

(*Circuit Court, E. D. Missouri, E. D.* September 17, 1888.)

1. VENDOR AND VENDEE—WHEN CONTRACT COMPLETE—ESTOPPEL.
Where, after negotiations by mail and telegraph for the sale by complainant to defendant of an interest in mining property, which, if consummated, would relieve complainant of liability for certain expenses of boring for minerals, an agreement is signed and mailed by defendant to complainant for his signature, which he does not sign, but signs and returns another, materially different in its terms, of which defendant does not indicate his acceptance by signing or otherwise, and afterwards draws on complainant for his part of said expenses, defendant cannot claim the transaction to be a completed sale.

2. EQUITY—RESCISSION—CONFIDENTIAL RELATIONS—MANAGING PARTNER.
The managing partner in a mine having actively concealed from his co-partner the fact that valuable ore had been found, the latter being absent, and having misled him as to its true condition by letters, a sale by the latter to the former at a grossly inadequate price will be set aside as fraudulent.[1]

[1] That equity will set aside a conveyance or sale obtained by failure to disclose material circumstances on the part of a vendee who stands in a confidential or fiduciary relation

3. SAME—LACHES.

Although complainant knew shortly thereafter that mining property which he had sold to his managing partner for a small price was very valuable, yet, as he did not know that the ore which enhanced its value was discovered before the sale until shortly before bringing suit to set the same aside for fraud, a delay of four years in attacking such sale would not bar complainant from relief.[1]

In Equity.

Bill by Frank J. Bowman against William F. Patrick and James M. Patrick, to set aside a conveyance alleged to be obtained by fraud.

*Erasmus McGinnis*, for complainant.

*Cunningham & Eliot*, for defendants.

BREWER, J. This is an action brought by complainant to set aside a sale of his interest in certain mining property known as the "Col. Sellers" and "Accident" mines, situated near the town of Leadville, in the state of Colorado, and to compel the defendants to account for all moneys received by them as proceeds of the interest so sold. The case is submitted on pleadings and proofs. The facts undisputed are these: In February, 1882, T. C. Stebbins and others owned the Col. Sellers and Accidents mining locations. In that month a contract was made between these owners on one side and the complainant and defendant William F. Patrick on the other, by the terms of which contract complainant and Patrick were to sink a good and substantial shaft down to limestone in place or bed-rock, unless pay mineral was sooner found; also to make application for patent title to said mining claims, and in consideration thereof were to receive a deed to an undivided one-half of the property. A deed in pursuance of this contract was executed and placed in escrow. Complainant and his partner, Patrick, entered upon the performance of this contract, the shaft was sunk, mineral was discovered, the deed placed in escrow was delivered, and the mine became a very profitable one. On October 19, 1882, complainant conveyed to said defendant Patrick his interest in the property, and this is the sale which is challenged. Complainant and defendant Patrick were partners in this contract, and the first question to be considered is the law which controls in sales by one partner to another.

The rule for the federal courts is laid down in *Brooks* v. *Martin*, 2 Wall. 70. In that case the court, after noticing the fact that some authorities hold generally that the relation between partners is a fiduciary one, and, declining to express an opinion whether that rule is one of universal application, notices these features in that special partnership: *First*, that one partner was present, and in the sole charge and management of the business, while the other was at a distance; *secondly*, that this was by arrangement between the partners, and, therefore, that the managing part-

---

to the vendor, or raise a trust in favor of the party defrauded, see Keith v. Kellam, 35 Fed. Rep. 243, and note; Hunt v. Patchin, Id. 816, and note; Miller v. Railroad Co., (Ala.) 4 South. Rep. 842, and note.

[1] As to what circumstances are sufficient to rebut the imputation of laches, see McCampbell v. McFaddin, (Tex.) 9 S. W. Rep. 138; Culver v. Pierson, (N. J.) 15 Atl. Rep. 269, and note.

ner was really an agent in charge.    Upon such a state of facts, in case of a sale by the managing partner to the other, the court thus states the rule:

"We lay down this as applicable to the case before us, and to all others of like character, that, in order to· sustain such a sale, it must be made to appear—*First*, that the price paid approximates reasonably near to a fair and adequate consideration for the thing purchased; and, *second*, that all the information in the possession of the purchaser which was necessary to enable the seller to form a sound judgment of the value of what he sold should have been communicated by the former to the latter."

The supreme court of the state of Missouri, the state in which complainant resided, and the supreme court of Colorado, the state in which the defendant lived, and where the property was situate, seem inclined to· go even beyond the supreme court of the United States in asserting the fiduciary nature of the relations between partners.    *Pomeroy* v. *Benton*, 57 Mo. 531; *Caldwell* v. *Davis*, (Colo.) 15 Pac. Rep. 696.    In this case it is conceded that complainant lived in St. Louis, and was only once in Colorado between February and October; that said defendant Patrick lived in Leadville, and had the active management of the business, and this by arrangement between the partners; so that the case comes squarely under the rule laid down in *Brooks* v. *Martin*.    That rule must therefore be regarded as controlling in this case.

The second question is, when did complainant make the sale to defendant?    Unquestionably the conveyance was not made until October 19th; but defendant insists that a binding contract of sale had been entered into theretofore, and that from the moment it was entered into the fiduciary obligations arising from the partnership ceased.    Fortunately the negotiations of the partners leading up to the sale were in writing, so that we do not have to depend upon the uncertain memory of witnesses.    On June 19th the parties met in St. Louis,—the shaft having been sunk a hundred feet or more,—and made a settlement.    Patrick was indebted to complainant for moneys paid out for him by complainant in some business transactions outside of this, which were allowed in this settlement, and a balance of $288.69 found due from the complainant to defendant on account of the moneys expended in sinking the shaft.    For that sum complainant gave his note, due in three months.    Up to this time nothing had been said in reference to a sale.    Patrick returned to Colorado, and complainant started to spend the summer in the woods in the northern part of Wisconsin, his post-office address being Bayfield, Wis.    On the 22d of June Patrick wrote from Colorado to complainant a letter containing this proposition:

"In regard to your interest in the Col. Sellers, I think I know a man who will pay the note you gave me, $288.69, and take your interest off your hands, and let me go right ahead with the work, which I would very much like to do.    If you are willing to let it go on these terms, which is the same proposition you made me in your office, please telegraph me immediately, and I will try to make the arrangement."

On June 27th he wrote another letter, containing this language:

"I would like to have an answer in regard to the proposition I made you about the Col. Sellers, to return you your note and forfeit your share in the contract. There is a party here who will take it."

And on June 28th a third letter, containing this:

"Please let me know what we are to do in this new complication, and also about the Col. Sellers, as I am anxious to continue work on that property, and see what is there."

These letters were forwarded to complainant in Wisconsin. On the 13th of July complainant came out of the woods to Ashland, where was a telegraph station, and sent this telegram to Patrick:

"Yours of June 22d received yesterday; proposition accepted; send note."

On July 15th Patrick answered by this telegram:

"Acceptance too late. Proposition was dependent on immediate acceptance in St. Louis. See my letter of fifth."

On July 16th, from St. Paul, complainant wrote this letter:

"When I came out of the woods I found your letter of June 22d waiting my answer, and I telegraphed you on same day, accepting your proposition to surrender to you all my remaining interest in the property adjoining the A. Y. on you surrendering my note; and on a perusal of your subsequent letters, received here at St. Paul to-day, I learn that is your wish. I do not complain of it. My judgment differs from yours as to the course to pursue, and I should not stand in your way, and will not. If you wish any papers signed, send, and I will sign them. My address is Bayfield, Wis."

According to his testimony he had received the letter of 22d June at Ashland, and the letters of the 27th and 28th after reaching St. Paul. On August 2d, defendant wrote complainant this letter:

"LEADVILLE, COLO., August 2, 1882.

"*Mr. F. J. Bowman*—DEAR SIR: Yours of the 16th ult. received. In accordance with your request therein I send the within paper for your signature. I sold the note in St. Louis, before getting your reply, so will have to wait until it matures, which will be Sept. 19th."

The paper inclosed in the letters of August 2d is, in full, as follows:

"*Memoranda* of agreement, made and entered into this —— day of ——, A. D. 1882, by and between Frank J. Bowman, of the city of St. Louis, state of Missouri, and William F. Patrick, of the city of Leadville, state of Colorado, witnesseth: That whereas, said above-named parties did, on the 17th day of February, A. D. 1882, enter into a certain contract in writing with Theodore C. Stebbins, Lyman Robison, Saml. J. Glover, and Harvey Howard, by the terms of which written contract the said Bowman & Patrick, in consideration of the conveyance to them by said Stebbins and others, above named, of the undivided one-half right, title, and interest in and to the 'Col. Sellers Lode' and the 'Accident' lode mining claims, agreed to sink a shaft upon one of said mining claims to pay mineral or limestone in place; and whereas, considerable work and development has been done and performed on said Col. Sellers lode, and the expense thereof has been borne principally by said Patrick, and said Bowman is unwilling to continue said work or pay any of the costs thereof; and whereas, on the 19th day of June, 1882, said Bowman executed and delivered to said Patrick his certain promissory note of that date for the sum of two hundred and eighty-eight dollars and seventy cents, due 90 days after date, and bearing interest at the rate of eight per cent. per annum, which

note was for said Bowman's proportionate share of the cost and expenses of working said Col. Seller's lode, and which had theretofore been paid by said Patrick; and whereas, said Patrick has negotiated and sold said note: Now, therefore, it is hereby agreed by the parties hereto, that if said Patrick will pay said note when the same becomes due, and save the said Bowman from the payment of the same, or any portion thereof, the said Bowman will release and surrender to said Patrick all his right, title, and interest in and to the above-described contract so made with said Stebbins and others to the property described therein. The said Bowman further agrees, on the payment of said note and the surrender of the same to him, to execute and deliver to said Patrick a good and sufficient deed of conveyance of his right, title, and interest in and to the mining property described in said contract, and known as the 'Col. Sellers' and 'Accident' lode mining claims, situated in California mining district, Lake county, Colorado, and the said Patrick agrees on his part, upon such conveyance to him, to release said Bowman from any and all liability under said contract so made with said Stebbins *et al.*, and to save said Bowman from all such liability.

"In witness whereof, the parties hereto have hereunto set their hands and seals, the day and year first above written.

"W. F. PATRICK.   [Seal.]

"Witness as to Patrick:   E. A. REYNOLDS."

In reply, and on August 28th, complainant sent this letter:

"CAMP NEAR BRULE RIVER, August 28, 1882.

"*Mr. Wm. F. Patrick*—MY DEAR SIR:   I send you the contract you desire, and trust this will settle our matters pleasantly and amicably.   I have inserted a clause concerning your brother's interest, but he may not care to retain it.   My address will be St. Paul, until Sept. 10th; then I shall return to St. Louis and business.   Yours truly,          FRANK J. BOWMAN.

"P. S.   Mails are slow here."

"Memorandum of agreement made and entered into this ―――― day of ――――, A. D. 1882, by and between Frank J. Bowman, of the city of St. Louis, state of Missouri, and Wm. F. Patrick, of the city of Leadville, state of Colorado, witnesseth:   That whereas said above-named parties did, on the 17th day of February, A. D. 1882, enter into a certain contract in writing with Theodore C. Stebbins, Lyman Robison, Samuel J. Glover, and Harvey Howard, by the terms of which written contract the said Bowman & Patrick, in consideration of the conveyance to them by said Stebbins and others above named of the undivided one-half right, title, and interest in and to the 'Col. Sellers' lode and the 'Accident' lode mining claims to pay mineral or limestone in place; and whereas, considerable work and development has been done and performed on said 'Col. Sellers' lode, and the expense thereof has been borne principally by said Patrick, and said Bowman has been and is unwilling to continue said work in such manner as said Patrick desires, or to pay any of the cost thereof if continued in such manner as said Patrick desires, or to pay any of the cost thereof if continued in such manner as said Patrick has directed; and whereas, on the 19th day of June, 1882, said Bowman executed and delivered to said Patrick his certain promissory note of that date for the sum of two hundred and eighty-eight dollars and seventy cents, due ninety days after date, and bearing interest at the rate of eight per cent. per annum, which note was for the full amount of said Bowman's proportionate share of the costs and expenses of working said 'Col. Sellers' lode, which then remained due and unpaid, all previous amounts having been fully paid by him; and whereas, said Patrick has negotiated and sold said note:   Now, therefore, it is hereby agreed by the parties hereto that said Patrick will pay said note

when the same becomes due and payable, and save the said Bowman from the payment of the same or any portion thereof, and in consideration thereof the said Bowman will release and surrender to said Patrick all his remaining interest in and to the above-described contract, so made with said Stebbins and others, and to the property described therein (reserving and excepting, for the use of the brother of said Patrick, a one-sixth interest in said contract, if he shall elect to pay his assessments thereon.) The said Bowman further agrees that, on the payment of said note, and the surrender of the same to him, to execute and deliver to said Patrick a good and sufficient deed of conveyance of his right, title, and interest in and to the mining property described in said contract, and known as the ' Col. Sellers ' and 'Accident' lode mining claims, situated in California mining district, Lake county, Colorado; and the said Patrick agrees on his part, upon such conveyance to him, to release said Bowman from any and all liability under said contract so made with said Stebbins *et al.*, and to save said Bowman from any and all such liability.

"Witness our hands and seals, this 28th day of August, 1882.

"FRANK J. BOWMAN."

These letters and telegrams are produced in evidence, their sending and receipt admitted. Beyond that defendant claims that on July 5th he wrote to complainant at St. Paul a letter, of which this is a copy:

"LEADVILLE, July 5, 1882.

"*Mr. Frank J. Bowman, Merchants Hotel, St. Paul, Minn.*—DEAR SIR: I send you a statement on all amounts paid on the Col. Sellers contract since our settlement, from which you will see that the amount due from you thereon is $952.32, for which amount I will draw on you to-morrow. I wish to notify you, and hereby do so, that if the draft is not paid, that I will apply to Stebbins and Robinson and their partners for a new contract in my own name. I have consulted an attorney here, and am satisfied that we are obliged to continue the work in order to comply with our contract, and that your plan of doing a little work every ten days would not be acting according to its letter or spirit, and would cause a forfeiture of the contract, and the loss of the amount we have spent in sinking the first 100 feet. The same attorney also tells me that, under our contract, if you do not pay your proportion when called upon, you forfeit your rights under said contract. I want to deal fairly with you, and will tell you that in my opinion the shaft, which is now 165 feet deep, is looking very promising; and I think we are not very far from the contact. My reasons for thinking so are that porphyry is now heavily iron-stained. Hope that you will pay the draft, and that we may continue to work together; but if you do not, I will have to protect myself, and will do so by taking the new contract as I have said. I withdraw my offer to return your note for $288.70, dated June 19, 1882, in case you assign your interest in the contract to me. Yours truly. W. F. PATRICK."

—And at the same time he drew a draft for the amount named in the letter upon complainant at the Merchants Hotel at St. Paul. This draft was not paid, and, according to complainant's testimony, was never presented to him, and it was sent by defendant indorsed, "without protest." This letter was not offered in evidence, and whether any such letter was received by complainant, and whether the copy offered is a correct copy of the letter sent, are both matters of dispute. There confessedly were no other communications, written or oral, save one to be hereafter noticed, between the parties until they met on October 19th, in St. Louis, when the deed was executed. Now, upon these facts it is clear that no

binding contract was entered into between the parties until that time. The letters in June from defendant contain no proposition of his own, but simply communicate the proposition of another party; while on July 13th complainant telegraphed accepting; yet, according to defendant's testimony,—and he cannot now be heard to deny it,—he had eight days before withdrawn the proposition, and two days after the telegram of July 13th he notifies complainant that his acceptance was too late. Of course he cannot now say that any contract was created by these communications. He himself had never made a proposition, and the party for whom he assumed to act had withdrawn his offer. While it is true that on July 16th complainant by his letter indicated a willingness to sell upon the same terms, yet the letter and agreement sent by defendant on August 2d was no acceptance of complainant's proposition. The agreement as prepared did not purport to bind defendant, but only to bind complainant. It was an attempt on the part of defendant to obtain an option on the property. The contract provides that if defendant shall pay the note of complainant, which had been theretofore negotiated by defendant, and which did not become due until September 19th, then complainant should deed; but no binding obligation is assumed by defendant. If he should fail to pay the note, the contract would become nugatory. Complainant, evidently unwilling to sign a contract which bound only one of the parties, on August 28th prepared a new contract, binding both parties, which he himself signed and forwarded. Defendant never signed or accepted this; for, although he now testifies that he considered the matter closed, yet no such unexpressed intention completes a contract. Up to October 19th nothing had been done by which either party was bound. Complainant might have withdrawn the proposed agreement of August 28th, and insisted upon retaining his share in the property, because his proposition had not been accepted; and defendant could have compelled ·complainant to pay his share of the expenses thus far incurred, because nothing had been done to release complainant from his obligations. As I said before, unexpressed intentions to accept constitute no acceptance. It would be strange indeed, if a party could avoid the obligations which spring from such confidential relations by saying that he intended to terminate them; for he was in a position—not bound by anything that had been done or said—to decline accepting, if before the 19th of October the absolute worthlessness of the mine had been disclosed. Until defendant had bound himself to purchase, complainant had the right to rely upon him for full information, and the obligation of full disclosure remained until there was some binding contract between the parties. It is not plaintiff's offer to sell, but defendant's promise to buy, which cancels the obligations. While the relation of partners continues, their duties and obligations remain. But defendant insists that the obligations of partners are mutual, and that his obligation to disclose fully was released by complainant's failure to pay his share of the expenses, and the case of *McLure* v. *Ripley*, 2 Macn. & G. 274, is cited. Conceding the full authority of that case, I think it not in point. On·June 19th the parties had settled, and complainant had

made satisfactory arrangements for his share. He never received the draft of July 5th. The circumstances under which it was sent indicate that payment was not expected, and it was sent simply for the purpose of crowding complainant out, and getting a new contract in defendant's separate name; for, in addition to what appears in the letter of July 5th, there is also a letter of the same date, written by defendant to his brother, in which this language is found:

"The shaft in the Col. Sellers is looking very promising. For several feet the porphyry has been heavily iron stained, and I have good reasons for thinking we are near the contact. Acting on Col. Bissell's advice, I to-day wrote to Bowman, telling him that if he did not pay up I would apply to the owners of the ground for a new contract in my own name, and leave him out. I don't suppose he will pay, but I will let you into the new one on the same terms you are in the old."

Obviously defendant was then intending to get rid of his partner, and resorted to this strategy of sending a draft to one whom he knew to be absent on a hunting expedition, from whom he could not at the time reasonably, and did not in fact, expect payment, and whom, possibly, he thought the draft would not reach. Such strategy does not commend itself to the conscience of a chancellor, and does not relieve the party from the pressure of fiduciary obligations.

The third question is this: Did defendant, prior to his purchase, disclose all the information in his possession which was necessary to enable complainant to form a sound judgment of the value of what he sold? In respect to this matter, also, the testimony speaks with no uncertain sound. On the 31st of August a large body of ore was discovered. This was before defendant left Leadville, and before he had received the contract of August 28th. He seems to have left immediately thereafter, in search of complainant. It is true, there was quite a flow of water at the same time, which prevented further work in the mine; but of the discovery of the ore, and that it was a large body of ore, there can be no doubt; nor that the defendant was fully aware of it. As to the exact nature of the discoveries prior to that in the mine, the testimony is not altogether clear. There is testimony tending to show that about the middle of August a vein of mineral was discovered, and on August 16th a contract was signed by defendant and the original owners of the mine in which it is recited that "a lode or vein is now by all believed to have been struck," and which provided for the delivery of the deed theretofore placed in escrow as soon as the shaft should have been sunk to the depth of 250 feet, 10 feet below the depth then reached. In fact the shaft was sunk to 265 feet, and the deed delivered by August 31st, so that long prior to the conveyance from complainant to defendant,—prior to the time he received from complainant the contract of August 28th, —the parties in Colorado had transferred the title, recognized full performance of the contract, and, in fact, it had been performed and mineral discovered. None of these facts were communicated to complainant. On the contrary, on September 2d defendant reached St. Louis, and, not finding complainant, sent him this letter, the obvious intimation of

v.36f.no.3—10

which was against the completion of the contract, receipt of the deed, or the discovery of mineral:

"I reached here this morning, and hoped to find you. I sent you from Leadville an agreement concerning the Col. Sellers, in which I agreed to pay that note, $288.70, and you relinquished all rights under the agreement. The shaft is still going down. The note will be due about September 19th, so please sign the agreement, if you have not already done so, and send to me as soon as possible, so that I may arrange to take up the note. My address for two or three weeks will be Knoxville, Tenn."

Beyond that, in the early part of August, indications of nearness of mineral were disclosed, and defendant admits that during that month he cautioned his relatives not to disclose the information he had furnished them concerning the mine, for fear it might reach the complainant. As indicating the dates of these communications to his relatives, and as tending to show the nature of the communications he made to them, a letter of August 17, 1882, written by his mother to her son, and one of August 24th, written by his father to his son, were offered in evidence. They contain these statements:

"On last Tuesday Eddie and self went to K., to bring out Mrs. Dickinson. We stopped to see Annie, of course. Found Mrs. Hale feeling better, but very weak. Annie was jubilant over a letter received the day before from Willie. He wrote her that they had found mineral in the Sellers, but, conservative as ever, thought it was only a small pocket in the porphyry. While we were there the evening mail brought another letter from W., which E. carried over to A., in order that we might have the very latest news before going home. In this letter he said that a clearly defined mineral vein extended entirely across the shaft, and he was more than pleased with the outlook of the mine."

"Annie was up to see us on Tuesday. She just got a letter from Will. He writes her the mine is all right. He is now going through a body of mineral that pays, and hopes to strike carbonates soon; and has resolved not to sell, but hold on to the mine. You must not write anything to St. Louis about it, as William has not got Bowman's deed yet,— only has a written promise for it. If you have written to any person, caution them to say nothing about it."

Again, shortly after October 19th, the time he received his deed from complainant, although the flow of water since the last of August had been such as to prevent further developments of the mine, his brother made a bet that within a year the Patricks would take from their interest in the mine more than $8,000 from sales of ore, and wrote to the defendant in respect to the bet, who, on October 29th, replied that he had refused $3,000 for a one-sixteenth interest, and that there was no question but that, if they could get the water under control, he could take out $8,000 or $80,000 within the year. I lay out of consideration the testimony given by complainant as to statements made to him on October 19th by James Patrick, for the reason that such statements are denied by James Patrick, and the testimony of complainant is not altogether satisfactory. Putting this one side, and resting solely upon that which is disclosed by the letters and contracts and the undisputed testimony of parties in no way interested, there can be no doubt that many, many facts affecting the value of the property were known to defendant

long before his purchase from complainant, and some time before he received the contract of August 28th, which he did not disclose to complainant. The case comes clearly within the rule of *Brooks* v. *Martin*, *supra*.

But it is further insisted by defendant that the claim is stale; that these transactions were in 1882, while this suit was not commenced until 1886; that in 1883 it became generally known that large bodies of ore were being taken out of the mine, and therefore complainant should have commenced this action earlier. It is enough to say in reply that there is not a syllable of testimony tending to show that complainant knew of the fraud practiced upon him until just before the commencement of this suit, and then only through some family trouble of the Patricks, in consequence of which certain letters were brought to his knowledge. He himself positively testifies that he had no suspicion of anything wrong. I do not understand that the mere fact that property which has been sold for a small sum a few months thereafter is found to be of exceeding value creates any suspicion of bad faith on the part of the purchaser, or casts any duty upon the seller to institute immediate inquiries to see if he has not been defrauded. On the contrary, he who acts in good faith generally presumes that the party with whom he has been dealing has acted in like good faith, and may safely rest upon that presumption until facts are called to his attention which indicate the contrary.

I think that that is about all I need to say. My conclusions rest but slightly upon the testimony of the complainant, but are reached almost entirely from the testimony of defendant, and those written matters of letter and contract which suffer nothing from failure of memory, but speak with the same language so long as they endure. My conclusion is that the sale made in October, 1882, cannot be sustained; that the complainant is entitled to a decree setting aside that sale, declaring him the owner of five forty-eighths of the property, and ordering a conveyance thereof by defendant, and an accounting. I see no reason for any decree as to James Patrick, and the bill as to him will be dismissed.