POMEROY, *Appellant,* v. BENTON.*

1. **Practice**: REMANDING WITH SPECIAL DIRECTIONS TO TRIAL COURT. When on hearing a cause in the Supreme Court a defendant is found to be a fraudulent trustee; and the cause is remanded with instructions to require him to account as such; the sole duty of the circuit court, or its referee, is to comply with the mandate; and neither the law or the fact adjudged by the Supreme Court can be re-tried below.

2. **Fraud, must be Proven.** When a plaintiff seeks relief against a contract on the ground of fraud, his action can only be maintained by proof of the fraud alleged. A finding that defendant is innocent of the fraud, followed by a judgment against him of $15,350.60⅜, is

---

*The reporter is indebted to Judge SHERWOOD for the syllabus and statement of this case.

erroneous. If there was no fraud in any of the ways charged, that was the end of the matter.

3. **Depositions.** The deposition of a defendant taken in the cause may be read in evidence by plaintiff if relevant as an admission of defendant, though he is present and willing to testify.

4. **Right to Adduce Evidence.** The plaintiff being on the witness stand offered to testify in his own behalf that he had never used the money of the firm for his private benefit; but the referee refused to allow him. It was error in the referee afterward to report that the plaintiff had so used the money of the firm.

5. **Referee's Report.** The report of a referee need not be approved in express terms. If exceptions are filed to the report and overruled, that is a sufficient approval of the report.

6. **A case of Fraud by a Trustee.** The testimony in the record strongly tends to show that: defendant deceived and misled the plaintiff's decedent by imposing upon him a false balance sheet of the business of the firm; that he fabricated the check of $5,421.16 put in evidence by him, in connection with his purchase of whisky through Bowen & Co.; that after commencement of the suit he destroyed a book in which he kept the account of his whisky transactions to cut off investigation, and refused when examined as a witness to furnish information which he must have possessed touching said transactions, pretending he did not know and could not remember what reasonably he ought to have known and remembered. It belongs to a trustee charged with a breach of trust to explain and make clear whatever is uncertain or complicated in the matter. He should distinctly draw the line which separates his honest from his dishonest gains, or submit to unfavorable presumptions.

7. **Odium Spoliatoris.** No fitter case can be presented for the application of the rule *omnia praesumuntur in odium spoliatoris.*

8. ———: SECONDARY EVIDENCE. The referee erred in holding this rule inapplicable until secondary evidence has been given in place of the suppressed or destroyed testimony. This would nullify the rule. If a party is armed with secondary proof he has no need of presumptions.

9. ———: PRESUMPTIONS. In such a case the court will enter into no minute calculations. The petition avers defendant by misuses of firm money made $200,000 profit on whisky. The court will presume this to be true. One-half of that sum belongs to Pomeroy. A decree will be entered in favor of his administrator for $100,000, with interest at six per cent per annum computed with annual rests to date of decree, but on the condition that plaintiff will abandon all claim on account of the voucher transactions.

10. **The Defendant Benton filed a Petition for Rehearing.** Af-

5—77

ter considering the petition the court modified its rulings as follows: (1) Though Egbert was not a partner, he was entitled to one-eighth of the profits, and seven-eighths of the profits only should be divided between the partners. (2) The court had erred in supposing the petition averred $200,000 profit was made on whisky; the averment being in fact, that $200,000 profit was made by defendant on whisky and other articles. (3) Though the rule *in odium spoliatoris* is justly applicable to defendant's conduct, the court on further consideration will presume the profits on whisky realized by defendant from misuse of firm money were only $100,000. One-eighth of the amount would belong to Egbert. and $43,500 to each partner. The decree will be entered against defendant for $43,500, with interest at the rate of six per cent per annum computed with annual rests from January 1st, 1865, to date of decree; that is to say $123,255, on condition that plaintiff release all further claim. NORTON, RAY and SHERWOOD, JJ., concur; HOUGH, C. J., and HENRY, J., dissent.

### *Appeal from St. Louis Court of Appeals.*

REVERSED.

January 13th, 1868, George Pomeroy filed his petition in the circuit court of St. Louis county stating that in 1858 he and the respondent Benton formed a partnership to conduct a wholesale dry goods business in the name of Pomeroy & Benton. They were to share equally the losses and profits. Neither was to engage in any other mercantile business, nor use the firm name otherwise than in its regular business, nor incur a personal liability for any other person without the written consent of the other partner. The partnership agreement was several times renewed. January 1st, 1862, it was extended for four years with an additional stipulation that ten per cent interest on the capital accounts could be withdrawn on the 1st days of July and January. The partnership business was continued until January 1st, 1865. During its continuance Pomeroy resided in New York and New Jersey. That Benton resided in St. Louis and had charge of the business of the house there, and full knowledge of all its details, and Pomeroy had only such information as he derived from Benton. In January, 1865, one year before the partner-

ship was to expire by the contract, Benton went to New York and purchased all Pomeroy's interest in the house for $275,000, much less than its value. That before Benton went to New York he had forwarded to Pomeroy a false balance sheet of the house. That to induce Pomeroy to sell, he falsely represented that the balance sheet set forth the true condition of the partnership business. That Pomeroy relied on these representations and sold accordingly. That Benton knew the balance sheet was false at the time of his representations. That said balance sheet contained no account of certain dealings of Benton with the moneys of the firm in government vouchers, receipts and securities, and whisky; and that in these dealings which were concealed from Pomeroy, the firm had realized a profit of $200,000.

The defendant Benton denied all charges of fraud; averred that the balance sheet was made up by the clerks of the house, and by them forwarded to Pomeroy. That the books of the house were faithfully kept, and open to Pomeroy's examination; and he had opportunity to know everything, and did know everything about them. Benton denied dealing with firm moneys as charged in the petition; and denied that profits were realized as alleged.

The cause was heard and decided by the circuit court in 1873 in favor of Benton. On appeal to the Supreme Court the judgment was reversed in 1874; 57 Mo. p. 531; the Supreme Court holding that Benton's dealings in vouchers and whisky were fraudulent and he must account therefor as a fraudulent trustee. When the cause was remanded to the circuit court Benton amended his answer to the effect that after January 1st, 1862, it was agreed that John D. Egbert, as an employe, should have one-eighth of the profits. That each partner might draw out from the capital $100,000, also small amounts of unemployed capital. Pomeroy's reply denied the allegations of the answer. June 12th, 1875, the cause was referred to Hon. Edward A. Lewis, to hear all competent testimony offered by the

parties and state the account between the parties in accordance with the opinion of the Supreme Court, and make report, etc.

September 15th, 1875, the hearing came on before the referee. The plaintiff's evidence, so far as material, was as follows :

(1) The articles of co-partnership.

(2) Andrew Johnson testified, that Benton told him he made a great deal of money in whisky and cotton. The profits were talked of as $100,000, and $75,000 in whisky. This was before the dissolution of the firm of Pomeroy & Benton, and in the presence of one Ramsey. Mr. Ramsey was called as a witness and contradicted the statement of Johnson.

(3) George H. Chase testified that just before the tax of $2 per gallon was imposed on whisky by congress, Benton told him he, Chase, had sold his high wines too soon. He did not say how many barrels of whisky he, Benton, had ·then ; but he put some figures on a paper which amounted to 60 or 70,000. No dollars or barrels were written, but the result produced by multiplication was 100,000. Benton appeared to wish to tease, and was drinking. It was the same day congress laid on the $2 tax.

(4) Hecter McLean testified he had an operation in whisky with Benton, thirty to fifty barrels bought of Mauntel Bulte & Co. prior to the $2 tax. Benton told McLean he made a heap of money on whisky.

(5) The plaintiff offered in evidence a deposition of Benton taken in the cause. Defendant Benton made two objections to reading this deposition. (1) It cannot be read as a deposition because defendant is present and ready to testify. (2) It cannot be read as an admission because it is a deposition. The referee sustained the objections. It was afterward admitted to impeach Benton as a witness for himself. In this deposition Benton testified he bought between 1,700 and 1,800 barrels of whisky, and no more; 1,000 barrels of it in Chicago, the rest in St. Louis. Could

not remember the persons from whom he got it; that he got some of Mauntel Bulte & Co. and Von Phul. Bowen & Co. bought some for him, and Catherwood bought thirty-six barrels. The money used to purchase it was raised by discounts. He could not tell if he used the firm name on the paper or not. He must have had a memorandum of the paper used, and he thought the names of Chase Bros. and Hastings & Gordon were on the paper. Could not recollect the amounts. The whole amount of paper discounted to buy the whisky was $70,000 about. Part of the discounts were at the State Savings Association; could not remember if all was discounted there. He could not remember if the name of Pomeroy & Benton was on the whisky paper or not. He had money of his own. Could not tell how many barrels Bowen & Co. bought for him, but it was 500 to 600 barrels. They rendered him bills of purchase. Don't know where they are; don't know how the bills were rendered, whether in the name of Bowen & Co., or Pomeroy & Benton or William H. Benton. Cannot remember. They were intended to be in name of William H. Benton. Cannot remember how many lots Bowen & Co. bought. He was not here, but the house of Pomeroy & Benton paid for the whisky by its check when he was not here. It was between $47,000 and $48,000. The money was charged to him. The money was his own and had been credited to him on the books of Pomeroy & Benton.

The witness further testified that after he was sued by Pomeroy he sent for John H. Bowen and had an interview with him at his, Benton's, house in St. Louis. That he desired to see Bowen about the whisky, and to learn from Bowen why an account of 142 barrels was in the name of Pomeroy & Benton. He, Benton, then and there had all the accounts of sales of whisky made for him by Bowen & Co. The net profits received by him on whisky was less than $20,000. If he had said he had bought 5,000 barrels of whisky it was jocular; he is now stating the truth.

Benton testified he did purchase government vouchers during said partnership, in 1864; could not remember the amount he paid for them by checks of Pomeroy & Benton. They were bought at a discount of from seven to eleven per cent; could not remember how soon he collected the vouchers from the government; the money used to buy the vouchers was charged to him; the check books of the house show the facts; and think he used $200,000 in the purchase of vouchers; cannot say that Pomeroy knew of his dealings in vouchers or whisky; believe he must have known it; he did not tell Pomeroy of it. He considered the risk his own, and paid the firm eight and a half per cent interest on the money used; cannot remember that Egbert was to have an interest in the whisky transaction. If he had it was only one-eighth of St. Louis whisky. Egbert's interest in Pomeroy & Benton was a contingent salary. Pomeroy had no interest in the whisky because he paid no attention to it.

On cross-examination Benton stated that from January 1st, 1864, to July 1st, 1864, each partner drew out of the firm $100,000 to use as he pleased; thinks he realized $26,000 to $27,000 net profit on vouchers; cannot remember exactly; there was a loss on the Bowen whisky about $150; that was 565 barrels, sold in July, 1864. Pomeroy had access to the books and is a competent bookkeeper. The bookkeeper sent the balance sheet to New York of his own motion. He, Benton, tried at first to sell to Pomeroy. He, Benton, made no representation about the balance sheet. He and Pomeroy both assumed it to be correct. Benton closed the purchase February 4th, 1865; to relate back to January 1st, 1865. Benton paid Pomeroy $151,000 and some hundred dollars in 5-20 United States bonds, and his notes for $62,500 payable in one and two years. He could not remember Pomeroy's ever speaking to him either about the whisky or voucher transactions. He could not say there is anything on the books to show Pomeroy he was charged interest on the money he used.

The witness testified he saw the balance sheet in Pomeroy's hands prior to the sale to him.

(6) The plaintiff put in evidence another deposition of Benton given by him on his own application to vacate an order of court upon him to produce, for the use of plaintiff, the book in which he kept an account of said whisky transactions. Benton testified he had entered in a book kept by him in 1864 all the accounts of said whisky transactions; it was a private book. He destroyed it in July, 1865; burned it up, because he had no use for it; having transcribed from it all live accounts into another book. He did not destroy all the book, but tore out the leaves that had the accounts on them and destroyed them. He did not destroy the binding of the book. What remained of the book, he said, was at his house. The whisky account was destroyed because he had no room to keep it. The whisky account was not contained in any other book. The whisky account was destroyed before this suit was commenced. After the commencement of the suit he had at his store the accounts of sale of the whisky; and had only one bill of purchase. In July, 1864, he gave all the bills of purchase of the whisky to Bowen; cannot remember ever seeing them since he gave them to Bowen, because the whisky was bought in his, Bowen's, name. The whisky was billed to Bowen & Co., and not to Pomeroy & Benton. Well, he don't know the memoranda of his purchases of vouchers were on Pomeroy & Benton's check books and cash books. All his private matters were entered in the burnt book. He burnt up the whole whisky matter.

Cross-examined. He said he bought the whisky with his own money. Part he sold in June, part in July, 1864. It was not a firm transaction. He destroyed the book because he did not wish any one to look into his private accounts. He often destroys his account books, but he can't now state everything as minutely about the whisky accounts as if he had the burnt book. That is, with the

exception of the amount of charges on thirty-six barrels.

(7) Wm. H. Sturgis testified that in the fall of 1864 Benton deposited in the bank of Sturgis & Sons; in Chicago, $60,000 or $70,000, saying, "this is one of my operations in high-wines;" this was after the government tax of $2 per gallon was imposed on whisky.

(8) John D. Egbert testified he was to have as compensation for service an interest in the profits of the house of one-eighth. He bought sixty barrels of whisky jointly with Benton. Never knew Pomeroy to use any money of the house for his own benefit. That he, Egbert, paid through Bowen for one lot of whisky $20,000.

(9) Edwin C. Catherwood testified that in 1864 he had a contract with Benton that in consideration of information given by him to Benton, that congress was about to levy a tax of $2 per gallon on whisky, Benton would invest $100,000 in whisky, hold it till the tax advanced the price, then sell it and divide the profits equally with Catherwood. That Benton told him he bought 500 barrels through Bowen in Chicago; also other lots witness could not remember. Benton paid witness $5,000; told witness he cleared $25,000 on whisky. That he, Benton, had had something to do with a large lot, but that was only as agent.

(10) John A. Mott testified he sold to Benton in February, 1864, 1,000 barrels of whisky at eighty-five cents per gallon, and in June, 1864, Benton sold it for $1.26 per gallon, and the net proceeds were $74,471.95.

(11) The check book and cash book of the house of Pomeroy & Benton showed that on August 11th, 1864, and from that day to and on December 13th, 1864, Benton purchased with funds of the house of Pomeroy & Benton, $297,571.69 of government vouchers, and realized a net profit thereon of $25,798.58. None of these profits were embraced in the balance sheet shown to Pomeroy for January 1st, 1865; nor did said balance sheet embrace any profits realized by Benton on whisky.

(12) The ledger of Pomeroy & Benton showed that between January 1st, 1864, and January 1st, 1865, Benton drew out of the house and used for some purpose of his own, $474,143.42.

(13) The burnt book was produced in evidence, and showed 117 pages cut out, many others partly cut out. The entries which remain to be seen aggregated over $100,000. The book contained originally 288 pages, and much of it was intact.

(14) The said ledger showed that the moneys drawn out by Benton were returned generally within a month.

(15) The cash diary of the house of Pomeroy & Benton showed that from January 4th, 1834, to December 22nd, 1864, Benton used $111,439.78, moneys of the house, which were not posted to his account nor entered on the cash book.

(16) C. W. Ford testified that Benton never told him what sums he invested in whisky, or what profit he made. But witness' idea from what Benton said is, they were large, and that Benton made a great deal of money.

(17) Munson Beach testified that the house of Pomeroy & Benton purchased vouchers largely in 1864. He went to collect $140,000 of vouchers at one time; collected $70,000 that time. It was in 1864 or 1865. He got the money by going into a private office of the quartermaster while many waited outside. Knows goods were sold for vouchers by Pomeroy & Benton.

(18) George Pomeroy, the plaintiff, testified he made the sale to Benton on the faith of Benton's statement that the balance sheet of January 1st, 1865, was correct; Benton said he knew it was correct; that he, Pomeroy, at the time knew nothing whatever of Benton's dealings in vouchers or whisky with the partnership funds. Benton having stated in a letter to Pomeroy, which was put in evidence, that Pomeroy had used the moneys of the house for his own private benefit, this witness was asked whether he had done so. The counsel for Benton objected to the ques-

tion as incompetent, because no such charge was made by
Benton against Pomeroy. The referee sustained the ob-
jection, and would not let the plaintiff answer.

(1) Wallace Delafield, for defendant, testified that he
was bookkeeper for Pomeroy & Benton from January,
1862, to January, 1865 ; made out the trial balance of Jan-
uary 1st, 1865, and forwarded it to New York. Benton
gave him no directions. The trial balance of July 1st,
1854, was made out by Mr. Medard, assistant bookkeeper.
That on the 19th of April, 1864, Pomeroy telegraphed
Benton to hold all greenbacks till further order, and there
never was a further order. The balances against Geo.
Pomeroy, the plaintiff, on the books of Pomeroy & Ben-
ton, were as follows:

| | |
|---|---:|
| January 1st, 1864, . . . . . | $ 60,000 00 |
| February 12th, 1864, . . . . | 60,483 33 |
| January 30th, 1864, . . . . . | 60,359 60 |
| February 26th, 1864, . . . . | 61,666 33 |
| March 29th, 1864, . . . . . | 27,289 83 |
| April 26th, 1864, , . . . . | 62,911 19 |
| May 27th, 1864, . . . . . | 63,847 19 |
| June 30th, 1864, . . . . . | 59,662 57 |
| July 1st, 1864, . . . . . | 100,000 00 |
| July 26th, 1864, . . . . . | 103,306 00 |
| August 31st, 1864, . . . . . | 104,541 15 |
| September 24th, 1864, . . . . | 115,572 12 |
| December 31st, 1864, . . . . | 103,000 00 |

Interest on this account at eight per cent per annum
was calculated every six months. There is on page 189 of
the cash book of Pomeroy & Benton an entry showing the
interest charged to Benton for moneys loaned him by the
house, was $352.08. He further testified he wrote to Bowen
& Co. a note, viz:

ST. LOUIS, June 30th, 1864.

*Messrs. John H. Bowen & Co.:*

*Dear Sirs:* We wish you would send us to-day a full

statement of high-wines bought and sold, as we wish to close up the account.   Upon receipt of the same, we will pay balance due you.

Yours truly,

POMEROY & BENTON.

(2) John H. Bowen, for defendant, testified that in 1864 his house sold whisky for Benton.   The amount was 812 barrels.   They rendered him accounts of sales for all but thirty-six barrels.   The accounts of sales were rendered in the name of Benton, and some Pomeroy & Benton.   Benton told him it was his whisky.   He knew of a 1,000 barrels bought by Benton in Chicago.   This witness was examined at length to find out the amount of whisky his house handled for Benton, and he gave it from time to time as 812 barrels bought and sold exclusive of the 1,000 barrels at Chicago.   The number of barrels purchased by his house for Benton in St. Louis, was stated to be 540, 550 and 565 ; the number of barrels sold by his house for Benton in St. Louis, he stated from time to time as 812, 876, 865, 849, 730, 875 and 776, and finally he could not remember; could not get possession of his books.   That he gave the bills of purchase to Benton, also the accounts of sales. That he saw all of them at Benton's house in St. Louis in 1868.   That Benton sent for him to come there, and the two went over all the whisky accounts.   Benton had these accounts in his possession, and showed him " What the whisky cost, so and so," and sold for " Such and such." Benton had a book.   The statement may have been in the covers of the book.   His recollection is, the book was open.   The account was loose within the book.   He supposes the account was on the leaves of the book.   The loose paper was an aggregate.   He and Benton were investigating; but he cannot tell what.   Benton wanted him to refresh his memory, but what about he cannot tell.   Benton's counsel called witness' attention to a paper in this form, viz :

| | | | | | |
|---|---|---|---|---|---|
| February 5th, 1864, bought | . | . | . | 1,000 | barrels. |
| May 21st, 1864, bought | . | . | . | 212 | " |
| June 25th, 1864, bought | . | . | . | 565 | " |
| | | | | 1,777 | |
| Also | . | . | . | . | 36 | " |
| Total | . | . | . | . | . | 1,813 |

"All the papers relating to this investment, except the check given to Catherwood in payment, were lost or destroyed at the time of removal of stock, books and papers from the corner of Washington avenue and Fourth to 513 Main street. Hence, I can't give items of storage, insurance," etc., and questioned the witness if that paper was not the one he saw at Benton's house in 1868. The witness said that may have been the paper. The witness being asked whether, on the first trial, he did not say in answer to the same question, "Before God, I never saw that paper before," replied, "I may have said so. I cannot identify the paper. I cannot recollect." Witness was asked by plaintiff's counsel to produce the sales book of his house, and said : "I don't know where it is. I can and will produce the ledger, day book, journal and blotter." He never did.

(3) Benton appeared again as a witness for himself and testified, so far as material; that Egbert was interested to the extent of one-eighth of the profits. He did not see the balance sheet or inventory before they were sent to Pomeroy. The clerks made them out. He took no part in it. He cannot relate the conversation with Pomeroy about the sale to him. It is natural for partners to talk over business ; but he cannot recollect the conversation ; cannot recollect the substance of it. It is a long time ago. He cannot say what examination Pomeroy made of the books when he came to St. Louis, once or twice a year. He saw them if he pleased. January 1st, 1864, the capital of each partner in the house was $140,000.

It was agreed in 1863 that each partner could draw out $60,000 up to January 1st, 1864; and $40,000 more up to July 1st, 1864. He drew out $60,000 and invested it in high-wines. Pomeroy told witness he drew out $60,000 and invested it in stocks. He Benton, began to purchase high-wines February, 1864, and sold all in July, 1864; purchased 1,813 barrels; sold 1,812, one lost by leakage. The proceeds of the 1,000 barrels bought in Chicago, viz: $74,-471.95, he deposited with Sturgis & Sons, bankers, in Chicago, on June 23rd, 1864. It was the only deposit he ever made there. All the bills of purchase of whisky were given to Bowen to sell the whisky. Never noticed till this suit that the account of sales for any of it was in the name of Pomeroy & Benton. The whisky was his own, and all bought with his own funds. He bought 248 barrels in St. Louis besides the 565 barrels Bowen bought for him; that is, 212 barrels of Mauntel Bulte & Co., and thirty-six barrels through Catherwood. Bowen & Co. bought 565 barrels. He paid Bowen & Co. for this whisky in six checks on the house of Pomeroy & Benton, which he produced. viz:

| | | | | |
|---|---|---|---|---|
| June 11th, 1864, | . | . | . | $ 3,000 00 |
| June 23rd, 1864, | . | . | . | 12,000 00 |
| June 27th, 1864, | . | . | . | 25,000 00 |
| June 29th, 1864, | . | . | . | 2,000 00 |
| June 30th, 1864, | . | . | . | 294 50 |
| July 1st, 1864, | . | . | . | 5,421 16 $47,715 66 |

There was no indorsement of Bowen & Co. on the check of July 1st, 1864. He had no bills of the purchase of this whisky; he gave them all to Bowen. In explaining this, Benton said he paid for this whisky in one single check for $47,715.66, and it was then found he had overpaid by the amount of the July 1st check, $5,421.66, and Bowen & Co. gave that check to him to pay back the overpayment. The account sales of the 565 barrels showed there were in the lot 29,312 17-100 gallons, and being purchased for $47,715.60, the cost per gallon was about $1.62.

The market price of whisky about the time of the purchase was $1.24 to $1.26 per gallon. The witness said he directed the bookkeeper to keep an accurate account of all moneys of the house used by him to buy vouchers, and charge him interest at eight per cent per annum. He had not looked particularly to see if it was done; can find on the books only two entries of interest, $352.08 and $130.67. The money used to buy whisky was raised by discounts at the State Savings Association; don't know what paper was discounted; it was about $70,000; cannot remember whose paper. He did not say to Chase what he testified, about his selling too soon, and he, Benton, holding a large amount of whisky.

(4) It was in evidence that the following paper of the house of Pomeroy & Benton was discounted by the State Savings Association for the benefit of Benton, all indorsed by Pomeroy & Benton:

| | |
|---|---:|
| February 5th, 1864, Ralli & Co., note . . | $20,000 |
| February 5th, 1864, Ralli & Co., note . . | 10,000 |
| February 4th, 1864, Hastings & Gordon's note | 10,000 |
| February 8th, 1864, Chase Bros.' note . . | 10,000 |
| February 8th, 1864, Chase Bros.' note . . | 10,000 |
| June 1st, 1864, Hastings, M. & Co.'s note . | 12,000 |
| Total . . . . . . . | $72,000 |

The learned referee, in his report, dissented from the views of the Supreme Court in 57 Mo. 531, holding that on the foregoing evidence Benton had not committed fraud but had acted in good faith; that the conduct of Benton was one of mistake at the most, mere unintentional error; that his, Benton's, testimony furnished in general a satisfactory explanation of his transactions. Nevertheless, considering that Benton had used a small portion of the moneys of the firm without authority, but in good faith, the referee recommended a judgment against him for $15,530.60, with simple interest from the institution of the suit; that the facts in evidence furnished no sufficient

ground of presumption *in odium spoliatoris*, and such presumption could never be admitted without previous introduction of secondary evidence of the contents of the destroyed evidence. The referee reported further, that on the testimony adduced, the plaintiff Pomeroy had misused the money of the firm for his own benefit, and was tainted with all the moral and legal wrong charged against Benton.

The novelty of the questions in this cause in this State, at least, and the importance of the principles discussed, have seemed to demand the foregoing full statement of the testimony.

*Glover & Shepley, Samuel Knox* and *James O. Broadhead* for appellant.

*J. M. & C. H. Krum, J. L. Smith, R. E. Rombauer* and *Cline, Jamison & Day* for respondent.

SHERWOOD, J.—When this cause was in this court on a former occasion, (57 Mo. 531,) we examined the record with the most patient and laborious attention. The result of that examination was, that the defendant was declared a fraudulent trustee, the judgment reversed, and the cause remanded with directions to have an accounting on that basis. The defendant did not move for a rehearing in this court either on matter of fact or matter of law. The cause on its return to the circuit court was committed to a referee, with instructions " to hear all competent testimony that may be offered by the parties, and state the account between said parties in accordance with the opinion of the Supreme Court herein, and make report," etc. The sole duty of the referee, as seen from those instructions, was simply to take an account of the amount due by defendant, treating him as a fraudulent trustee, for this was "in accordance with the opinion of the Supreme Court herein." But the learned referee could not, as seen by his report,

confine himself within the narrow limits assigned him; he
must needs investigate other things and look into other
matters, *de hors* his duties and instructions. He must needs
see whether the opinion of this court was correct, and
wherein he deemed it incorrect, he must needs proceed to
correct it.

The record now before us does not substantially differ
from that presented on a former occasion. There was an
array of evidence showing the defendant's fraud, which
we regarded as conclusive, and so found and declared when
we reversed the judgment and remanded the cause. We
have ruled that where we have remanded a cause with
directions as to the further proceeding of the trial court,
that there the case does not present the same phase as if
there had been a simple reversal and remanding; that
when special directions have been given as aforesaid, it is
out of the power of the lower court to open the cause and
have a new trial. *Chouteau v. Allen,* 74 Mo. 56. Under
this ruling even the circuit court would have been powerless
to have done otherwise than as in our mandate directed,
and of consequence so would the referee. But the referee
was not content to yield obedience either to our mandate
or the instructions of the circuit court. We found in the
record abundant *indicia* of fraud. The referee took it upon
himself to say that there was no fraud, although upon
every hand, in this, as in the former record, fraud and
fraudulent practices on the part of the defendant in appro-
priating the funds, credits and assets of the partnership to
his own use; in deceiving his partner by a false balance
sheet, and false representations concerning the same; in
the destruction and fabrication of evidence; in evading at
the hearing direct questions as to matters with which he
must have been familiar, and with which a court of equity
will hold he was familiar; in answering that he did not
know, could not remember, etc., respecting amounts, dates
and other things touching the transactions in which he
had been engaged, which even the most ordinary memory

could not fail to recall—are patent to even the most cursory observation. The referee, however, notwithstanding that, in the face of the finding and judgment of this court, and it may be added in the face of the most convincing testimony to the contrary, he acquitted the defendant of the charge of fraud, yet nevertheless, he found the defendant indebted to the plaintiff in a comparatively small sum, $15,350.60⅝, with simple interest thereon from date of suit brought January 13th, 1868, at six per cent.

This finding and ruling of the learned referee was erroneous upon the facts in evidence as it was illogical in law. If there was no fraud on the part of the defendant in any of the ways charged in the petition, then the plaintiff's case fails, and that is the end of the matter. In the absence of fraud or improper concealment, its equitable equivalent, the agreement, the bill of sale of January 1st, 1865, being sufficiently comprehensive in its terms, passed to defendant every right and interest in the partnership affairs which the plaintiff possessed, and operated, on its execution, as an absolute discharge of further liabilities of defendant to the plaintiff respecting the same. This view of the point was very properly taken by the court of appeals, His Honor, Judge Bakewell,very pertinently observing, (in an opinion which does not appear in print): "But if that deed was obtained in good faith it was clearly a complete discharge. To hold that the settlement with, and deed of Pomeroy, was not a discharge, is plainly to hold that they were obtained by misrepresentation; that the balance sheet exhibited to plaintiff by defendant, upon the faith of which plaintiff sold his interest in the concern to defendant for $275,000, was accompanied with concealment concerning the business of the firm and the value of plaintiff's interest in it."

This is what the Supreme Court finds. The referee finds the contrary. The two findings cannot stand together. If Benton was guilty of no unfairness, he should not have been charged at all; the settlement should not

be opened. If he is to be considered in all respects as a fraudulent trustee, he should have been treated and charged in all respects as a fraudulent trustee. Interest should not have been computed without rests, merely as simple interest at six per cent, and presumptions should have been indulged against him, which on his theory of the case the referee did not and could not indulge. To say, as the Supreme Court does, that Benton is to be treated in all respects as a trustee, is to find that he obtained an unfair advantage, or the words have no meaning at all." But the learned judge speaks apologetically for the referee, by saying, " He felt himself hampered, no doubt, by the opinion of the Supreme Court, and having arrived upon the same evidence at an opposite conclusion on the question of fraud." Had the learned judge been at the pains to read the evidence as well as the ruling made by the referee, which he confesses he did not, he would not have thought that the latter " felt himself hampered " either by the opinion of this court, or indeed by that of any other court or by the text writers.

For instance, among the rulings of the learned referee (which were for the most part in favor of the defendant), the plaintiff offered as evidence in chief the deposition of defendant taken in this cause June 8th, 1868. To this deposition defendant's counsel took two novel objections: 1st, That it could not be read as a deposition because the defendant was present. 2nd, Nor as an admission because it was a deposition. These objections were held well taken and the deposition rejected. Nor was it admitted at all, except as impeaching evidence. It is scarcely necessary to say that this ruling of the learned referee has no support either in reason or authority. If defendant had made an admission verbally on the street respecting the subject matter of the suit, it would have been original evidence against him and *a fortiori* would it, when contained in a deposition taken under the solemn forms of the law. Weeks

on Dep., § 464; *Kritzer v. Smith*, 21 Mo. 296; *Charleson v. Hunt*, 27 Mo. 34.

The deposition, however, is preserved in the record, and we shall treat it as though admitted in chief. The learned referee did not see fit in his voluminous report to make allusion to this important ruling, which so far as concerned his action, deprived the plaintiff of most important and original evidence. Not less peculiar was another ruling made by the learned referee; he refused to permit plaintiff to testify that he had never used a dollar of the money of the firm at New York, and yet in his report, he found and adjudged that plaintiff made overdrafts and was tainted with all the moral and legal wrong which could attach to the defendant for such uses of the firm money. Properly enough the learned referee refused permission to plaintiff to testify as above stated; for there was no such issue raised by the pleadings; but for the self-same reason, also, he should have refrained from passing upon what was not before him; thereby reducing, if possible, plaintiff, whose testimony and conduct were characterized by the utmost straightforwardness, ingenuousness and candor, to the level of that of the defendant, whose testimony and conduct were a mere tissue and series of evasions, subterfuges and fraudulent devices.

But we pass from the action of the referee to that of the circuit court and that of the court of appeals. The latter court entertained the view that it could not consider the cause on its merits, and, therefore, remanded it, because the circuit court did not approve the report of the referee. This view was not a sound one. The circuit court did approve the report of the referee. This was the necessary consequence of overruling the exceptions of the plaintiff, whose exceptions, twenty-three in number, covering every part of the report, were considered and all overruled but two, and those only partially. No proposition in law is better established than that the report of a referee is confirmed when exceptions thereto are held for naught.    2

Barb. Ch. Pr. 555; 2 Smith Ch. Pr. 378; *Huston v. Cassidy,* 14 N. J. Eq. 320; *Davis v. Roberts,* 1 Sm. & M. Ch. 543; *O'Neill v. Capelle,* 62 Mo. 202; *Taylor v. Read,* 4 Paige 561.

For this reason, the court of appeals should have proceeded to examine the cause on its merits and entered a final judgment adjusting the matter at issue between the parties litigant. We shall proceed to such adjustment now, and doing so, we shall not in this opinion, examine the evidence in detail; we shall not make minute calculations as to the misappropriation by defendant of this amount in the purchase of high-wines; or that amount in the purchase of vouchers, or the defendant's profit arising therefrom. Any complication or uncertainty pertaining to these matters it belonged to the defendant as a trustee charged with a breach of trust to explain and make clear; to distinctly draw the line which separated his honest gains from those which were grossly otherwise. Failing in this, as he did, all doubts must be resolved against him. So say all the authorities. Kerr Fraud and Mistake, pp. 151, 182; *Pomeroy v. Benton, supra; Heath v. Waters,* 40 Mich. 457; 1 Glf. Ev., § 34.

It is impossible to tell what was the amount which the defendant realized by reason of his fraudulent practices. The self-same evasive manner which characterized the defendant's testimony on a former occasion, characterizes it still. Therefore, our remarks heretofore made respecting it are still applicable, and we repeat them. The statement is indeed made by the learned referee that the defendant made full explanation of his whisky, voucher and other transactions. This statement finds no support in the facts disclosed by this record. There is abundant testimony contained therein showing that defendant was engaged in whisky transactions other than those which resulted in the purchase and sale of 1,813 barrels of whisky; and we are warranted in presuming against the defendant as a fraudulent trustee who forgets, who cannot remember when asked the plainest and most direct questions about the

simplest matters, that it was his duty to remember, that the magnitude of his transactions in vouchers have been but partly ascertained. How often the money defendant invested, in vouchers or in whisky either, was turned over, was re-invested, never will be known.

We have mentioned heretofore the fabrication of evidence. There is much in this record to induce us to believe that the check for $5,421.16 was fabricated for the occasion in order to show that the sum of $47,715.60 was paid for the purchase of 565 barrels of whisky. Unfortunately, however, for the success of the scheme, the check was never handed to Bowen & Co. to be indorsed by them, so that this check, as the matter stands, shows that Bowen & Co. had received on the big check for $47,715.60, $5,-421.16 more than was due them, and in order to pay this back to Benton the check for the latter sum was drawn by Pomeroy & Benton on their cashier, and by him indorsed to Benton. It is clear that if that check had ever been collected by Bowen & Co., it would have borne their indorsement. The books abound with instances as to the unfavorable presumptions to be indulged against those who manufacture evidence. 3 Glf. Ev., § 34; *Winchell v. Edwards*, 57 Ill. 41; 1 Phil. Ev., 639.

We come now to the destruction of evidence by the defendant; of the destruction of the book in which the accounts of his whisky transactions were kept. We passed upon this point when this cause was here before. We see no reason now to change, but every reason to support and confirm the conclusion then reached, that defendant destroyed that book after suit brought, for the deliberate and sole purpose of cutting off investigation into the magnitude of his operations in whisky. As, then, the defendant has done these things, as he has endeavored by all these means to baffle inquiry and shut out investigation; as in consequence thereof, it has become impossible to ascertain the amount out of which he has defrauded his partner, to whom, as he says in one of his letters, he was bound

by the ties of gratitude, for giving him his start in life, nothing remains to us but to apply to the defendant, the stern rule recognized alike in equity and at law embodied in the maxim *omnia praesumuntur in odium spoliatoris.* No fitter case than the one in hand could ever be presented for the application of this rigid maxim.

The learned referee appears to have thought, for so he reported to the circuit court, that before the rule can be applied " secondary evidence" as to the contents or character of the evidence destroyed must first be introduced; must be laid as a basis before the presumption can be invoked. Nothing can be further from the law. It would seem too plain for argument, that if secondary evidence were at hand, all need for the application of the rule would cease, and that if the rule could not be applied unless upon the production of secondary evidence, then the spoiler could assure his success, by cutting off every source of information and every supply of evidence; could become successful in proportion to the destruction he had wrongfully wrought. The authorities give no countenance to such an idea. It is because of the very fact that the evidence of the plaintiff, the proofs of his claim or the muniments of his title, have been destroyed, that the law, in hatred of the spoiler, baffles the destroyer, and thwarts his iniquitous purpose, by indulging a presumption which supplies the lost proof, and thus defeats the wrong-doer by the very means he had so confidently employed to perpetrate the wrong. One of the familiar illustrations given of invoking and applying the presumption, was where the plaintiff " a chimney-sweeper's boy found a jewel and carried it to the defendant's shop (who was a goldsmith) to know what it was, and delivered it into the hands of the apprentice, who, under pretense of weighing it, took out the stones, and calling to the master to let him know it came to three half-pence, the master offered the boy the money, who refused to take it, and insisted to have the thing again, whereupon the apprentice delivered him back

the socket without the stones," and on trover brought, " several of the trade were examined to prove what a jewel of the finest water that would fit the socket would be worth, and the chief justice directed the jury, that unless the defendant did produce the jewel, and show it not to be of the finest water, they should presume the strongest against him, and make the value of the best jewels the measure of their damages, which they accordingly did." *Armory v. Delamirie*, 1 Stra. 505. It is easy to see that the chimney-sweep's boy would have been in but sad case, if he had been required to show by " secondary evidence," what the contents of the empty socket were; something which he knew not; something which the spoliating defendant alone knew.

Numerous instances are given in the books of the like application of the rule, where it is held that spoliation of documentary evidence being proved against a defendant, that thereby he is held to admit the truth of the plaintiff's allegations; and this upon the ground that the law, in consequence of the fraud practiced, in consequence of the spoliation, will presume that the evidence destroyed would establish the plaintiff's demand to be just. 1 Glf. Ev., § 37; *Barker v. Ray*, 2 Russ. Ch. 73; 1 Taylor Ev., p. 130, § 116; *Dalston v. Coatsworth*, 1 P.Wms. 731, and cases cited; Broom's Leg. Max., 938, and cases cited; 1 Phil. Ev., 602, and cases cited; Anon., 1 Ld. Raym., 731; *Attorney Gen'l v. Windsor*, 24 Beav. 679; *Heath v. Waters*, 40 Mich. 457; *Annesley v. Anglesea*, 17 How. St. Tr. 1139; *Ld. Melville's case*, 29 How. St. Tr. 550; *Blade v. Noland*, 12 Wend. 173; *Harwood v. Goodright*, Cowp. 86.

As a sufficiently full statement of the evidence will be made, we deem it unnecessary to encumber this opinion by going into the evidence in detail. But upon perusal of that statement, it will be found that a sufficient basis has been laid in that evidence, from which the presumption may be properly invoked, whether we adhere to the extreme application of the rule as announced by Lord El-

don in *Barker v. Ray, supra*, or whether we apply the presumption in a more limited way as indicated by some of the authorities.

Applying, then, the rule mentioned, to the case before us, we shall hold the defendant is indebted to the plaintiff, as charged in the petition, which alleges that defendant dealt in whisky, thereby realizing a net profit to the amount of $200,000. One-half of this sum would, of course, belong to plaintiff, and treating the defendant as a trustee guilty of a flagrant breach of his trust, we, therefore, order, adjudge and decree, that interest at the highest legal rate, (where there is no contract,) six per cent, be computed with annual rests on the sum of $100,000, from the 1st day of January, 1865; that the judgment as well of the circuit court as of the court of appeals be reversed and judgment entered for said sum last named, and interest, either here or else in the lower court, leaving it optional with the plaintiff in respect to the court where judgment shall be entered.

In relation to the voucher transactions of defendant, we are by no means satisfied with the findings of the learned referee. He fails, as we think, to charge the defendant with such an amount as the evidence in our opinion shows the defendant should be charged, and the learned referee fails to draw the proper inference respecting one important item of $58,592.48, being a certificate of indebtedness of the United States. Concerning this certificate the defendant was silent, and the referee erred in supposing the voucher represented by this certificate to be a part of those in exhibit W 2. If the plaintiff desire, we shall direct another accounting in the lower court, to be taken on the evidence now in this record, of those voucher transactions; in which accounting such unfavorable presumptions as the law authorizes will be indulged against the defendant, treating him as a fraudulent trustee. But we leave it optional with plaintiff, whether he will have such fresh accounting, or whether he will enter a waiver thereof

in this or the lower court.  NORTON and RAY, JJ., concur; HOUGH, C. J., and HENRY, J., dissent.

### On Rehearing.

NORTON, J.—It is insisted by the counsel in their motion for rehearing that the judgment rendered is excessive, first, because Egbert, a clerk in the mercantile house of Pomeroy & Benton was to receive as compensation for his services one-eighth of the profits, no account of which was ever taken into consideration, and secondly, because the rule *in odium spoliatoris* was improperly applied, in this, that the sum of $200,000, alleged to be the profits arising out of speculations in whisky and other articles of merchandise, was improperly taken as the measure of defendant's liability; for the reason that the amount of profits made from the purchase of whisky and high-wines could only be ascertained and distinguished from the profits made in speculations in other merchandise, such as cotton, tobacco, bacon, lard, etc., by a resort to the evidence.  Both these positions seem to be well taken.  While the mere fact that Egbert was to receive as compensation a certain portion of the profits of the capital invested in the concern, did not create the partnership relation between Egbert, Pomeroy and Benton, he was clearly entitled under it to the portion of the profits stipulated for.  While it may not have given him a right to have sued as a partner for an adjustment and settlement of partnership accounts, he was, nevertheless, entitled, when such adjustment was made and the profits ascertained, to his proportion.

While we are of the opinion that because of the destruction, by Mr. Benton, of the book containing an entry of all his transactions in whisky or high-wines, he became a spoliator, and subjected himself in this court to the application of the rule of law governing and applied in such cases, and while we are of the opinion that the rule in its utmost stringency would justify us in taking the

amount of profit made out of high-wines and whisky, as claimed in the petition, when supported by the slightest evidence, as the measure of his liability, we think that error was committed in taking $200,000 as that amount, because the petition did not allege that $200,000 were the profits made in speculations in whisky, but that said amount of profits was not out of whisky and high-wine operations alone, but out of speculations in other articles of merchandise as well. It is impossible to tell, from the mere allegations of the petition, what proportion of the $200,000 was made in operating in whisky and high-wines, and what proportion in other merchandise, and the problem can only be solved by looking at the evidence and giving force and effect to the rule *in odium spoliatoris* in considering it.

The evidence shows, beyond question, that Benton speculated in whisky and high-wines with the means of the firm in 1864, and prior years, and that during that year he made large profits in these operations; one or more witnesses testifying to the fact that they understood from Mr. Benton, that his profits on the whisky on hand would be $100,000, and there is other testimony in the record, tending to show the same fact. How much of said profit would be made out of whisky purchased with the money of the firm in excess of the amount he had a right to draw from the firm does not clearly appear. But from this and other evidence showing that he had used money of the firm in whisky transactions, the inference may well be drawn, under the rule above referred to, that the said profit was the result of speculations made with firm money, and we, therefore, take that, as the amount, with one-half of which, after deducting Egbert's interest of one-eighth, which it appears Benton had purchased, with which he should be charged. Said one-eighth interest being deducted from said sum would leave $87,500, one-half of which Benton should account to plaintiff for, with interest thereon at six per cent with annual rests, from the 1st day of January,

1865; and proceeding on this basis, the plaintiff is entitled to a judgment of $123,255. If, therefore, plaintiff will enter a *remittitur* of so much of the judgment heretofore rendered as is in excess of said sum, on or before the first day of the next term of this court, the motion for rehearing will be overruled, and if not, the motion will be sustained.

HOUGH AND HENRY, JJ.—Being of the opinion that the rule *in odium spoliatoris* has not been correctly stated or applied in the opinion of the majority, and being further of the opinion that an account should be stated between the parties as directed by this court when the case was first here, (57 Mo. 549,) and that the judgment of this court should be based upon such an account, we are in favor of sustaining the motion for a rehearing.